IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| Parents Protecting Our Children, an unincorporated association | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 3:22-cv-00508 |
| Eau Claire Area School District, Wisconsin; Tim Nordin, President, Eau Claire Area Board of Education, in his official capacity; Lori Bica, Vice President, Eau Claire Area Board of Education, in her official capacity; Marquell Johnson, Clerk/Governance Officer, Eau Claire Area Board of Education, in his official capacity; Phil Lyons, Treasurer, Eau Claire Area Board of Education, in his official capacity; Joshua Clements, Board Member, Eau Claire Area Board of Education, in his official capacity; Stephanie Farrar, Board Member, Eau Claire Area Board of Education, in her official capacity; Erica Zerr, Board Member, Eau Claire Area Board of Education, in her official capacity; Michael Johnson, in his official capacity as Superintendent of Eau Claire Area School District, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Jury Trial Demanded |
| *Defendants* | ) ) ) ) | |

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

## INTRODUCTION

1.      This suit seeks to vindicate parents' fundamental rights to care for and raise their children, and to religious freedom.

2.      The defendants have formulated, approved, adopted, and conducted training on the Eau Claire Area School District's ("ECASD") "Administrative Guidance for Gender Identity Support" (the "Gender Identity Policy"). This Gender Identity Policy applies to all Eau Claire Area School District schools and its employees. Contrary to constitutional rights and federal law, it mandates that schools and teachers hide critical information regarding a child's health from his or her parents and to take action specifically designed to alter the child's mental and physical well-being. Specifically, the Policy allows and requires District staff to treat a child as if he or she is the opposite sex, by changing the child's name, pronouns, and intimate facility use, all without the parents' knowledge or consent. The District's training on its Gender Identity Policy told teachers that "parents are not entitled to know their kids' identities" and that parents must "earn" that knowledge. At least one teacher has posted a flyer reading, "If your parents aren't accepting of your identity, I'm your mom now."

3.      ECASD requires a school and its staff to hold secret meetings with children to develop a "Student Gender Support Plan." At the same time, when interacting with the child's parents, the Gender Identity Policy requires school officials, teachers, and administrators to continue using the child's actual name and pronouns so the parents will not be alerted to the changes the school has made.

4.      The obvious purpose of such secrecy is to prevent parents from making critical decisions for their own minor children, from interfering with the school's ideologically-driven activities, from caring for their children, or from freely practicing their religion.

5.      The insidious invasion of parental rights at issue in this case cannot be tolerated by a free people who value liberty.

## PARTIES

6.      Parents Protecting Our Children, UA, is a group of parents who have created an unincorporated nonprofit association in accordance with Wis. Stat. § 184.01. Every member of the Association resides in the Eau Claire Area School District and has children that attend ECASD schools.

7.      Eau Claire Area School District is a school district organized according to the laws of the State of Wisconsin.

8.      Michael Johnson is the district Superintendent. He is a citizen of the State of Wisconsin. At all times Mr. Johnson was responsible for implementing the district's Gender Identity Policy. He is sued in his official capacity.

9.      Tim Nordin is the President of the Eau Claire Area Board of Education. He is a citizen of the State of Wisconsin and is sued in his official capacity.

10.     Lori Bica is the Vice President of the Eau Claire Area Board of Education. She is a citizen of the State of Wisconsin and is sued in her official capacity.

11.     Marquell Johnson is the Clerk/Governance Officer of the Eau Claire Area Board of Education. He is a citizen of the State of Wisconsin and is sued in his official capacity.

12.     Phil Lyons is the Treasurer of the Eau Claire Area Board of Education. He is a citizen of the State of Wisconsin and is sued in his official capacity.

13.     Joshua Clements is a Board Member of the Eau Claire Area Board of Education. He is a citizen of the State of Wisconsin and is sued in his official capacity.

14.     Stephanie Farrar is a Board Member of the Eau Claire Area Board of Education. She is a citizen of the State of Wisconsin and is sued in her official capacity.

15.     Erica Zerr is a Board Member of the Eau Claire Area Board of Education. She is a citizen of the State of Wisconsin and is sued in her official capacity.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

17.     The Court has authority to issue a declaratory judgment, to order injunctive relief, attorneys' fees, and other relief that is necessary and proper under 28 U.S.C. §§ 2201, 2002 and 42 U.S.C. §§ 1983, 1988.

18.     Venue is appropriate under 28 U.S.C. § 1391(b)(2).

## FACTS

19.     The school district adopted a policy entitled: "Administrative Guidance for Gender Identity Support." (<u>Exhibit A</u>.)

20.     ECASD has implemented the policy district-wide and has conducted training on how the policy is to be implemented.

21.     The policy states that its purpose is to "facilitate compliance with district policy."

22.     It encourages students to "contact a staff member at the school to address any concerns, needs, or requests" related to gender nonconformity or identification with a transgender or "non-binary" identity.

23.     This contact initiates a process where the school and its staff create a "Student Gender Support Plan" with the student. (<u>Exhibit B</u>.)

24.     The Gender Support Plan has blank spaces for District staff to record a new name, pronouns, and gender for a child, which intimate facilities the child will use, and who should be told about the child's newly acquired "gender identity."

25.     The Gender Support Plan specifically asks if "parents/guardians" are "aware of their child's gender status" or "aware of [the] student's requests at school" with yes/no check boxes, allowing District staff to make these critical decisions without any parental involvement or awareness.

26.     The Gender Support Plan identifies the actions to take if the "yes" box is checked to both questions about parents, but it fails to identify any actions to take if a "no" box is checked.

27.     The section of the Plan entitled "Parent/Guardian Involvement" appears as follows:



¶

¶

**PARENT/GUARDIAN·INVOLVEMENT**¶

Are·parents/guardians·of·this·student·aware·of·their·child's·gender·status?·☐Yes···☐No¶

Are·the·parents/guardians·aware·of·student's·requests·at·school?·☐·Yes···☐No¶

If·yes·to·both·statements·above,·at·parents'·request·ECASD·will·walk·them·through·the·Skyward· name·process·and·Student·ID·card·change.¶

→    -Preferred·name:·Click·or·tap·here·to·enter·text.¶

→    -Pronouns:·Click·or·tap·here·to·enter·text.¶

→    -Restroom:·Choose·an·item.··(Please·note·not·all·schools·are·equipped·with·gender-neutral·restrooms·at·this·time.)¶

→    -Locker·room:·Choose·an·item.¶

→    -School·field·trips·(lodging·for·overnight·trips):·Click·or·tap·here·to·enter·text.↵

→    (Please·see·Administrative·Guidelines·Section·VII·for·more·information.)¶

What·considerations·might·need·to·be·accounted·for?¶

Click·or·tap·here·to·enter·text.¶

28.     The Gender Support Plan identifies the facilities the child can use, including restrooms, locker rooms, facilities for class trips, and lodging for overnight trips.

29.     For overnight trips, there is no requirement that anyone notify the parents that their children will be staying in overnight opposite-sex lodging facilities. The only requirement is that appropriate accommodations are made with the lodging facility.

30.     There are also sections for extracurricular activities, including who needs to be notified regarding the plan for extracurricular activities, what to do if there are siblings, and how to support the siblings.

31.     The Gender Support Plan and Gender Identity Policy lack any requirement to notify the student's parents that ECASD is renaming their child or giving him or her a new gender identity. There is no requirement to notify the parents that their child will be using opposite-sex intimate facilities. There is no requirement to notify the parents that their child will stay in opposite-sex overnight lodging.

32.     The Gender Identity Policy requires school personnel to speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent/guardian—if the school ever tells the parents— because the student may not be "open" at home.

33.     The Gender Identity Policy requires administrators and staff to "respect the right of an individual to be addressed by a name and pronoun that corresponds to their gender identity. *A court-ordered name or gender change is not required, and the student need not change their official records.*" (emphasis in original). This means the school will address a child by his or her chosen name and gender pronouns regardless of parental notice or consent.

34.     ECASD's Policy does not contain any age limit for this policy, allowing District staff to facilitate a gender identity transition at school, in secret from parents, even for students in grade school.

35.     The Policy requires schools to use the "name and gender preferred by the student" on any documents where "the district is not legally required to use a student's legal/birth name and gender." The Policy states that "Student ID Cards are not legal documents, and therefore, may reflect the student's preferred name."

36.     Upon information and belief, the ECASD has conducted trainings for its teachers on the Policy. As part of that training, a "Facilitator Guide" for "Session 3: Safe Spaces" was used by the "facilitator" or the person conducting the training. (Exhibit C.) When discussing slide 56, the Facilitator is directed to emphasize for the participants that "parents are not entitled to know their kids' identities," but must "earn" that knowledge:

**Slide 56– Talk amongst yourselves!**
Facilitators, guide this discussion. Remember, parents are not entitled to know their kids' identities. That knowledge must be earned. Teachers are often straddling this complex situation.  In ECASD, our priority is supporting the student.

37.     The same training is overtly antagonistic toward religious parents. The Facilitator's notes remind the facilitator that while parents' objections to the "LGBTQIA+" agenda will likely be from religious parents, not all religion is the problem. Instead, it is the "weaponization of religion against queer people" that is the problem. That is, parents whose core religious beliefs conflict with the "LGBTQIA+" agenda are the problem.

38.     During the online training session entitled "Safe Spaces Part Two," Christopher Jorgenson states: "We understand and acknowledge that teachers are often put in terrible positions caught between parents and their students. But much like we wouldn't act as stand-ins for abuse in other circumstances, we cannot let

parents' rejection of their children guide teachers' reactions and actions and advocacy for our students."  He continues reading from the slide which states: "Religion is not the problem. Discrimination is the problem. Bigotry as ideology is the problem. The weaponization of religious beliefs against marginalized people is the problem."

39.    This same training states: "We handle religious objections too often with kid gloves . . ." and that if the parents' have a "faith-based rejection of their student's queer identity" then the school staff "must not act as stand-ins for oppressive ideas/behaviors/attitudes, even and especially if that oppression is coming from parents."

40.    This training teaches that parents who are not affirming are abusing their children, are "oppressive," and not supportive of their own children.

41.    ECASD sees its role as superior to that of the parent in determining what care is appropriate for a parent's gender-questioning child, and it denies any parent whose view conflicts with ECASD's preferred treatment options from information about their own child.

42.    ECASD's policy is not to tell parents if a student identifies as a different sex or gender and uses a different name and pronouns at school.

43.    Specifically, ECASD's Gender Identity Policy targets religious parents as having abusive and oppressive ideas/behaviors/attitudes, and takes the position, as official District Policy, that those parents have not "earned the right" to know critical information about their own children.

44.     The Gender Identity Policy necessarily interferes with the parent/child relationship by creating a new name and gender identity for the parent's child without notifying the parents or obtaining their consent before treating their child as if he or she is the opposite sex. The Policy also interferes with the parent/child relationship by allowing the child to use opposite-sex intimate facilities and opposite-sex overnight lodging on overnight field trips without the parents' knowledge or consent. The Policy requires affirming a child's gender transition without parental consent.

45.     The Gender Identity Policy shows ECASD's clear and impermissible hostility toward the sincere religious beliefs that motivate religious parents.

46.     The Gender Identity Policy interferes with a parent's religious freedom to raise their children according to their religious beliefs by creating a new name and gender for the parent's child. The Gender Identity Policy also interferes with the parent's religious freedom to raise their children according to their religious beliefs by allowing children to use opposite-sex intimate facilities and overnight lodging on overnight field trips.

47.     The Gender Identity Policy requires staff and teachers to interfere with the parental relationship.

48.     Teachers have taken the Gender Identity Policy as a mandate to interfere with the parent/child relationship, as illustrated by a teacher's flyer posted at North High School in the Eau Claire Area School District, stating that "if your parents aren't accepting of your identity, I'm your mom now.":

 

49.     ECASD's policy runs directly against the recommendations of medical experts with decades of experience treating gender dysphoria and children wrestling with gender identity and their biological sex.

50.     Multiple studies have shown that the vast majority of children who struggle with their gender identity or experience gender dysphoria ultimately resolve to comfort with their biological sex, *if* they do not transition or receive immediate affirmation that their perceptions represent their true identity.

51.     In light of that evidence, and for other reasons, many experts recommend *against* "affirmation" and an immediate transition, and instead believe the appropriate first response is to help children dealing with these issues to process and understand what they are feeling and why. *E.g.*, Kenneth J. Zucker, *Gender Dysphoria in Children and Adolescents*, *in* PRINCIPLES AND PRACTICE OF SEX THERAPY 395, 414–15 (6th ed., 2020); Stephen B. Levine, *Reflections on the Clinician's Role*

*with Individuals Who Self-identify as Transgender*, Arch. Sex. Behav. (2021); Laura Edwards-Leeper and Dr. Erica Anderson, *The mental health establishment is failing trans kids*, Washington Post (Nov. 24, 2021), https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/ (arguing that "comprehensive assessment and gender-exploratory therapy is the most critical part of the transition process."); *Questioning America's approach to transgender health care*, The Economist (Jul. 28, 2022), https://www.economist.com/united-states/2022/07/28/questioning-americas-approach-to-transgender-health-care (noting that medical groups in Sweden and Finland are "moving in the opposite direction" from "the 'affirmative model,'" and instead "now prioritis[ing] therapy."); Jasmine Andersson & Andre Rhoden-Paul, *NHS to close Tavistock child gender identity clinic*, BBC News (July 28, 2022), https://www.bbc.com/news/uk-62335665 (a review found that the clinic was "not a safe or viable option" for children, in part due to its "unquestioning affirmative approach," and instead recommending a more "holistic" approach).

52. Many experts believe that facilitating a transition and treating a child as if he or she is the opposite sex by using a different name and pronouns can do long-term harm to the child by reinforcing a false belief, causing that belief to set in and reducing the likelihood that the child will find comfort with his or her body. *E.g.*, Kenneth J. Zucker, *The Myth of Persistence: Response to "A Critical Commentary on Follow-Up Studies & 'Desistance' Theories about Transgender & Gender Non-Conforming Children" by Temple Newhook et al.*, 19:2 Int'l J. of Transgenderism 231

(2018) ("I would argue that parents who support, implement, or encourage a gender social transition (and clinicians who recommend one) are implementing a psychosocial treatment that will increase the odds of long-term persistence.").

53.     Even the World Professional Association for Transgender Health ("WPATH"), a transgender advocacy organization that strongly endorses transitioning—and which Plaintiffs by no means endorse—acknowledges that "[s]ocial transitions in early childhood" are "a controversial issue" and that "health professionals" have "divergent views" on this issue. World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* at 17 (version 7, 2012).

54.     WPATH also recognizes that "[t]he current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition during early childhood." *Id.*

55.     And WPATH characterizes social transition as a "therapeutic" "treatment option" for gender dysphoria. *Id.* at 9 (listing "changes in gender expression and role" *first* in its list of "options for psychological and medical treatment of gender dysphoria.").

56.     Multiple studies have found that the vast majority of children (roughly 80-90%) who experience gender dysphoria or identify as transgender ultimately "desist," or find comfort with their biological sex and cease experiencing gender dysphoria as they age. *See* WPATH Guidelines at p. 11 (listing studies).

57.     Given the lack of evidence and divergent views on this sensitive issue, WPATH recommends that health professionals defer to *parents* "as they work through the options and implications," even if they ultimately "do not allow their young child to make a gender-role transition." *Id*. at 17.

58.     Parents have no way to know, in advance, if or when their children will begin to wrestle with their gender identity, experience discomfort with their biological sex, or experience gender dysphoria.

59.     The first indications that a child may be dealing with gender identity issues or gender dysphoria may arise at school, unbeknownst to parents.

60.     Indeed, ECASD's policy and practices make this more likely by openly encouraging students struggling with these issues to come to teachers first—by, for example, displaying posters that say, "if your parents aren't accepting of your identity, I'm your mom now."

61.     Thus, if adult staff at ECASD follow their Gender Identity Policy and begin treating a child as if he or she is really the opposite sex at school, without parental notice or consent, ECASD may do long-term damage to the child's psyche and sense of identity before the parents even become aware that the harm has been done.

62.     There is no good evidence at this point about the long-term implications of a transition during childhood.

63.     Thus, treating children as if they are the opposite sex is effectively a psychosocial experiment on children.

64.    Transgender social transition is also a form of psychosocial medical/psychological treatment.

65.    ECASD is providing psychosocial medical/psychological care through transgender social transition and is intentionally not obtaining parental consent.

66.    Providing psychosocial medical/psychological treatment to children without parental consent lacks the informed consent necessary and violates the substantive due process rights of parents.

67.    Gender dysphoria can also be a serious mental-health condition that requires professional help.

68.    Children dealing with gender dysphoria or questioning their gender identity often present with other comorbidities, including depression, anxiety, and suicidal thoughts, and may urgently need professional support.

69.    A child's desire to socially transition, to change name and pronouns, is a well-recognized indicator that the child may be dealing with gender dysphoria and should be professionally evaluated.

70.    Teachers and staff at ECASD have no expertise in diagnosing and treating gender identity issues or gender dysphoria.

71.    Teachers and staff at ECASD have no lawful authority to make treatment decisions for minor students in their care during the day.

72.    The Gender Identity Policy was not developed with parental input.

73.    The Gender Identity Policy is not publicly available and parents in the Eau Claire Area School District do not have access to it.

74. The members of Parents Protecting Our Children have a clearly established fundamental right to the care, custody, and control of their children, to raise their children according to their religious beliefs, and to raise their children without the State unconstitutionally interfering with their relationship with their child.

75. The members of Parents Protecting Our Children have each been injured by the Policy's violation of their constitutional rights. The secrecy with which schools are to operate pursuant to the Gender Identity Policy necessarily means there is no way for each member parent to determine if their child has been targeted by the school. Further, the Gender Identity Policy itself is not public. As such, the PPOC Members have each suffered an ongoing or threatened concrete injury to their parental and religious rights.

76. The injury for each member is the same, each member would have standing to sue individually, the members are seeking to protect interests germane to the organization's purpose, and neither the claims asserted nor the relief requested requires the participation of individual members.

## FIRST CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS
### (Violation of Fundamental Parental Rights Under Fourteenth Amendment, 42 U.S.C. § 1983)

77. Plaintiff incorporates all of the preceding allegations.

78. The relationships between PPOC members and their children are constitutionally protected through the Due Process Clause and made applicable to the defendants through the 14th Amendment to the United States Constitution.

79.     Fit parents are presumed to act in the best interest of their children.

80.     PPOC's members have the fundamental Constitutional right to make decisions concerning the care, custody, and control of their children.

81.     When the government denies parents that right and takes it for itself, the government violates the parents' fundamental parental rights.

82.     Defendants have concealed the Gender Identity Policy from parents, preventing PPOC's members from knowing if the school has already applied this policy to their children, or will apply this policy to their children in the future, which interferes with the parents' ability to direct their children's upbringing.

83.     The defendants, by requiring schools and teachers to secretly "support the transition" of a child to a different "gender" by providing psychological or psychiatric counseling or treatment, changing their name and pronouns and their intimate facility usage and overnight accommodations, all without parental notice or consent, directly interferes with the parent/child relationship, the parent's ability to make health-related decisions for their child, and denies PPOC members their fundamental right to make decisions concerning the care, custody, and control of their children.

84.     Among other things, the defendants intentionally interfere with parents' ability to seek and provide professional assistance their children may need by hiding from parents that their child is dealing with gender identity issues.

85.     An unemancipated minor child cannot grant informed consent for psychosocial medical/psychological treatment and counseling that the defendants impose.

86.     The Policy requires the school to provide psychosocial medical/psychological care to children without parental consent, violating parents' fundamental liberty interest in parenting their children, including selecting a treatment approach that does not involve an immediate gender transition.

87.     The Policy is not narrowly tailored to achieve a compelling governmental interest.

88.     The Policy fails to satisfy any legitimate governmental interest.

**SECOND CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS**
**(Violation of Plaintiff's Religious Freedom Under the First**
**Amendment, 42 U.S.C. § 1983)**

89.     Plaintiff incorporates all of the preceding allegations.

90.     Most PPOC members have sincerely held religious beliefs that there are only two sexes, that their children were born either male or female, and that this characteristic is immutable.

91.     PPOC's members believe that the two sexes are a core part of God's intended design for humanity and that the sex each of us is born with is a gift, not an arbitrary imposition. *See* Genesis 1:27 ("male and female he created them"); Matthew 19:4 ("the Creator made them male and female"); Mark 10:6 ("But at the beginning of creation God 'made them male and female.'")

92.     As a direct result of their religious beliefs, if these PPOC members'
children ever experience gender identity issues or gender dysphoria, they would not
immediately "affirm" whatever beliefs their children might have about their gender,
but would instead remind them that they were "fearfully and wonderfully made," *see*
Psalm 139:14, and seek to help them identify and address the underlying causes of
their discomfort with their body and learn to accept and embrace their God-given sex.

93.     At the same time, PPOC's members will never stop loving their children,
or love them any less, no matter what their children might believe about their gender.

94.     The First Amendment to the United States Constitution guarantees
PPOC's members the right to freely exercise and practice their religion without
governmental interference.

95.     PPOC members' have a fundamental right under the First Amendment
to make decisions concerning the care, custody, and control of their children in
accordance with their religious beliefs.

96.     The defendants have violated this right by implementing a secret policy
to affirm a child's perceived or desired gender identity without parental notice or
consent, which interferes with PPOC's members' right to choose a treatment
approach that is consistent with their religious beliefs and does not involve a social
transition.

97.     ECASD's Gender Identity Policy, which requires hiding from parents
their child's struggle with gender identity issues, also directly interferes with PPOC's

members' right to teach and guide their children through gender identity issues in accordance with their religious beliefs.

98.   ECASD has no compelling governmental interest in keeping secret from parents that their child is dealing with gender identity issues or gender dysphoria or that staff are treating their child as if he or she is really the opposite sex while at school. Even if there were some compelling reasons for secrecy in some rare situation, ECASD's Gender Identity Policy is not narrowly tailored to such a situation.

99.   The Gender Identity Policy fails to satisfy any legitimate governmental interest.

### THIRD CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS
### (Violation of Parental Rights Under Article 1 § 1 of the Wisconsin Constitution)

100.   Plaintiff incorporates all of the preceding allegations.

101.   The Wisconsin Constitution provides "the same equal protection and due process rights afforded by the Fourteenth Amendment to the United States Constitution." *Mayo v. Wisconsin Injured Patients & Families Comp. Fund*, 2018 WI 78, ¶ 35, 383 Wis. 2d 1, 914 N.W.2d 678.

102.   Any governmental action that "directly and substantially implicates a fit parent's fundamental liberty interest in the care and upbringing of his or her child" is "subject to strict scrutiny review." *Matter of Visitation of A. A. L.*, 2019 WI 57, ¶ 22, 387 Wis. 2d 1, 927 N.W.2d 486.

103.   The Defendants' requirement that the school and its staff hide from a parent that his or her child is dealing with and/or receiving psychological or

psychiatric counseling or treatment for "gender identity" issues, has been assigned a different name and pronouns or authorized to use opposite-sex intimate facilities or opposite sex overnight accommodations violates the PPOC members' fundamental right to make decisions concerning the care, custody, and control of his or her child, for all of same reasons described in Plaintiffs' First Cause of Action.

104.    Therefore, the defendants have violated Article 1, Section 1 of the Wisconsin Constitution.

## FOURTH CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS
### (Violation of Article 1 § 18 of the Wisconsin Constitution)

105.    Plaintiff incorporates all of the preceding allegations.

106.    The Wisconsin Constitution "provides much broader protections for religious liberty than the First Amendment." *Coulee Cath. Sch. v. Lab. & Indus. Rev. Comm'n, Dep't of Workforce Dev.*, 2009 WI 88, ¶ 66, 320 Wis. 2d 275, 768 N.W.2d 868.

107.    Parents have a fundamental right under Article 1, Section 18 of the Wisconsin Constitution to raise their children in accordance with their religious beliefs and without governmental interference.

108.    The defendants have denied PPOC's members their fundamental right to make decisions concerning the care, custody, and control of their children in accordance with their religious beliefs.

109.    PPOC's members believe that the two sexes are a core part of God's intended design for humanity and that the sex each of us is born with is a gift, not an arbitrary imposition. *See* Genesis 1:27 ("male and female he created them"); Matthew

19:4 ("the Creator made them male and female"); Mark 10:6 ("But at the beginning of creation God 'made them male and female.'")

110.   As a direct result of their religious beliefs, if these PPOC members' children ever experience gender identity issues or gender dysphoria, they would not immediately "affirm" whatever beliefs their children might have about their gender, but would instead remind them that they were "fearfully and wonderfully made," *see* Psalm 139:14, and seek to help them identify and address the underlying causes of their discomfort with their body and learn to accept and embrace their God-given sex.

111.   At the same time, PPOC's members will never stop loving their children, or love them any less, no matter what they believe about their gender.

112.   PPOC members' have a fundamental right under Article 1, § 18 of the Wisconsin Constitution to make decisions concerning the care, custody, and control of their children in accordance with their religious beliefs.

113.   The defendants have violated this right by implementing a secret policy to affirm a child's perceived or desired gender identity without parental notice or consent, which interferes with PPOC's members' right to choose a treatment approach that is consistent with their religious beliefs and does not involve a social transition.

114.   ECASD's Gender Identity Policy, which requires hiding from parents their child's struggle with gender identity issues, also directly interferes with PPOC's members' right to teach and guide their children through gender identity issues in accordance with their religious beliefs.

115.     ECASD has no compelling governmental interest in keeping secret from parents that their child is dealing with gender identity issues or gender dysphoria or that staff are treating their child as if he or she is really the opposite sex while at school. Even if there were some compelling reasons for secrecy in some rare situation, ECASD's Gender Identity Policy is not narrowly tailored to such a situation.

116.     The Policy is not narrowly tailored to achieve a compelling governmental interest.

117.     The Policy fails to satisfy any legitimate governmental interest.

### FIFTH CAUSE OF ACTION: VIOLATION OF 42 U.S.C. § 1983
### (Failure to Notify Parents and Obtain Written Consent)

118.     Plaintiff incorporates all of the preceding allegations.

119.     Plaintiff seeks redress for the deprivation of rights secured by the Protection of Pupil Rights Amendment, 20 U.S.C. § 1232h.

120.      ECASD receives federal funds.

121.     The Protection of Pupil Rights Amendment, 20 U.S.C. § 1232h, and its implementing regulations, 34 C.F.R. Part 98, apply to ECASD.

122.     Congress enacted the Protection of Pupil Rights Amendment to protect PPOC's members' fundamental right to make decisions concerning the care, custody, and control of their children. It prohibits, *inter alia*, "psychiatric or psychological treatment," meaning the use of methods or techniques that are not directly related to academic instruction and designed to affect behavioral, emotional, or attitudinal

characteristics of an individual, without prior written consent of an unemancipated minor's parent or guardian.

123.   As a matter of federal law, ECASD's Gender Identity Policy includes psychiatric or psychological testing and treatment because it is designed to affect behavioral, emotional, or attitudinal characteristics of a student identifying as transgender.

124.   The Gender Identity Policy and corresponding Gender Support Plan's primary purpose is to reveal information related to gender identity, sexual behavior, and personal attitudes. Therefore, ECASD was on notice that such testing and treatment should not be provided without prior written consent from a parent or guardian.

125.   However, with respect to the Gender Identity Policy and certain other matters, the Defendants chose to keep secret psychological and psychiatric testing and treatment from the student's parents. This policy of inaction was deliberate and implemented despite the known or obvious risk of a Constitutional violation arising from a failure to notify parents and obtain their consent prior to such psychological and psychiatric testing and treatment, including *inter alia*, changing a child's name, pronouns, or intimate facilities, and/or providing counseling or other interventions related to "gender" matters.

126.   ECASD's policy of secrecy violates federal statutory law and is the functional equivalent of an intentional decision by the defendants to violate the PPOC members' Constitutional rights.

## DEMAND FOR RELIEF

Plaintiff respectfully requests that the Court:

a.      Enter a permanent injunction that prevents Defendants from interfering with Plaintiff's Members constitutionally protected First and Fourteenth Amendment rights;

b.      Enter a permanent injunction that prohibits Defendants from interfering with Plaintiff's Members constitutional rights secured by Article 1, §§ 1 and 18 of the Wisconsin Constitution;

c.      Enter a permanent injunction that prohibits Defendants from relying on, using, implementing, or enforcing the Gender Identity Policy in any way;

d.      Award costs and attorneys' fees under 42 U.S.C. § 1988; and

e.      Award all other relief that the Court deems just, proper, or equitable.

Respectfully Submitted,

AMERICA FIRST LEGAL FOUNDATION

*/s/ Nicholas R. Barry**
Nicholas R. Barry
TN Bar No. 031963
Nicholas.Barry@AFLegal.org

Reed D. Rubinstein*
DC Bar No. 400153
Reed.Rubinstein@AFLegal.org
300 Independence Ave SE
Washington, DC 20003
Telephone: (202) 964-3721
**Pro hac vice motion forthcoming*

WISCONSIN INSTITUTE FOR LAW & LIBERTY

*/s/ Luke N. Berg*

Luke N. Berg (WI Bar No. 1095644)
Rick Esenberg (WI Bar No. 1005622)
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Luke@will-law.org

*Attorneys for Parents Protecting Our Children, UA*