IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| Parents Protecting Our Children, an unincorporated association | ) ) ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | Case No. 3:22-cv-00508 |
| Eau Claire Area School District, Wisconsin; *et al.,* | ) ) ) ) | |
| *Defendants* | ) ) | |

---

## Plaintiff's Response to Defendants' Motion to Dismiss

---

### INTRODUCTION

Parents Protecting Our Children has sued the Eau Claire Area School District (the "District") because of its Policy instructing staff to treat children suffering from gender identity issues without prior notice to and consent from their parents. DE 1, ¶ 2; DE 12, Defendant's Motion to Dismiss, p. 17.[1] The District's Policy of secrecy, and lies targeting mothers and fathers deemed insufficiently supportive of their child's gender wishes, without notice or hearing, unlawfully interferes with the constitutionally protected parent-child relationship. *See Troxel v. Granville,* 530 U.S. 57, 65-67 (2000) (plurality opinion); *Brokaw v. Mercer Cnty.,* 235 F. 3d 1000, 1019

---

[1] Items filed in the Court's ECF system are identified by their Docket Entry (DE) number and paragraph or page number.

(7th Cir. 2000) (citing *Croft v. Westmoreland Cnty. Child. & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997)). The Policy also violates parents' federal statutory right to know if a school is gathering information regarding sex behavior and attitudes from a child, or otherwise providing psychiatric or psychological examinations, tests, or treatment with respect thereto. 20 U.S.C. § 1232h; 30 CFR § 98.4.

Plaintiff's members are parents with standing. *Contra* Defendants' claims, the controlling authorities do not require a parent to have a gender-confused child to challenge the District's Policy. Rather, the District subverts the constitutionally protected fundamental liberty interests of Plaintiff's members in parenting their children, in establishing and maintaining their family, and in preserving the natural bond of affection between parent and child by, *inter alia*, encouraging secrecy about a child's gender confusion and denying parents the ability to consent to care. The District's purposeful denial of parents' informational rights is concrete, not speculative, harm. *See e.g., MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007); *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015).

## FACTUAL BACKGROUND

The District's Policy (the "Policy") (DE 1-3) at issue requires teachers and staff to treat a child who declares gender confusion as if he or she is a member of the opposite sex, by changing the child's name, pronouns, and intimate facility access. DE 1, ¶¶ 2, 33. This sometimes occurs as part of a "Student Gender Support Plan." DE 1-4. In preparing this plan, the Defendants necessarily collect protected personal information about, *inter alia*, a child's sex behavior and attitudes.

A child's desire to "socially transition" by changing names and pronouns is a well-recognized indicator that the child may be dealing with gender dysphoria and should be professionally evaluated. DE 1, ¶ 69. Neither the District nor its teachers and staff are qualified to diagnose or treat this malady. DE 1, ¶ 70. Also, the District's Policy encouraging "social transition" is a form of psychosocial medical/psychological treatment, DE 1, ¶ 64, that runs against the recommendations of medical experts with decades of experience treating gender dysphoria in children. DE 1, ¶¶ 49, 51-57. Even the World Professional Association for Transgender Health ("WPATH") recommended that because of the lack of evidence and the divergent views on this sensitive topic, health professionals should defer to *parents* even if the parents ultimately "do not allow their young child to make a gender-role transition." DE 1, ¶ 57. Regardless, no law authorizes the District to take social transition measures without prior parental notification and consent.

Nevertheless, the District's Policy is that if a child directs staff to hide her gender confusion from her parents, then staff and teachers must ensure the gender "social transition" takes place at school without parental knowledge. DE 12, p. 3, 17. To advance the deception, the District requires teachers and staff to continue using the child's actual name and pronouns when addressing her parents so they will not be alerted to the changes the school has made. DE 1, ¶¶ 2-3, 36, DE 1-5.

The District is deeply committed to subverting the traditional parent-child relationship. DE 1, ¶¶ 2, 36; DE 1-5. Teacher and staff training included, *inter alia*:

- The claim that "parents are not entitled to know their kids' identities."
  DE 1, ¶ 36.

- The warning that objections to the "LGBTQIA+" agenda will likely
  come from religious parents, and that the problem is the
  "weaponization of religion against queer people." DE 1, ¶¶ 37, 38.

- The statement that: "We understand and acknowledge that teachers
  are often put in terrible positions caught between parents and their
  students. But much like we wouldn't act as stand-ins for abuse in other
  circumstances, we cannot let parents' rejection of their children guide
  teachers' reactions and actions and advocacy for our students." DE 1,
  ¶ 38.

- The assertion that "We handle religious objections too often with kid
  gloves" and the affirmation that even if a parent has a "faith-based
  rejection of their student's queer identity" teachers and staff "must not
  act as stand-ins for oppressive ideas/behaviors/attitudes, even and
  especially if that oppression is coming from parents." DE 1, ¶ 39.

- The conclusion that parents who are not "affirming" of their child's
  social transition or gender identity are oppressive and abusing their
  children. DE 1, ¶ 40.

Parents have no way to know, in advance, if their child will suffer from this
malady. DE 1, ¶ 58. The first indications that a child may be dealing with gender
identity issues may arise at school, unbeknownst to parents. DE 1, ¶ 59. But instead

of informing parents, the District encourages students struggling with these issues to come to teachers first—by, for example, displaying posters that say, "if your parents aren't accepting of your identity, I'm your mom now." DE 1, ¶ 60.

Thus, if adult staff at the District follow their Gender Identity Policy and begin treating a child as if he or she is really the opposite sex at school, without parental notice or consent, the District may do long-term damage to the child's psyche and sense of identity before the parents even become aware that the harm has been done. DE 1, ¶ 61.

Defendants state, multiple times, that Plaintiffs have "mischaracterized" the Policy, "applied it in a vacuum," or that Plaintiff has made "unsubstantiated claims" regarding the Policy. But, Defendants own recitation of the facts proves otherwise. Defendants confirm that the Policy operates exactly as Plaintiff has alleged: "Parent inclusion in these discussions [about a Gender Support Plan] is encouraged **unless the student explicitly tells staff not to do so.**" DE 12, p. 3 (emphasis added). Defendants later argue that "the Guidance [Policy] balances the interests of parents with that of students who express concerns about revealing their gender identity to potentially unsupportive parents by encouraging parental involvement **unless directed not to do so by the student.**" DE 12, p. 17 (emphasis added). Here, Defendants dispense with the need for the Court to assume the allegations related to the Policy are true and instead admit that Plaintiff's allegations are correct: the District will socially transition a child without notifying the parent or obtaining their parents' consent.

# ARGUMENT

The question presented in this case is whether parents have the right to know and ultimately make the decision about whether adult staff at school will treat their children as the opposite sex while at school. Remarkably, the Defendants argue that parents' rights hinge on the child's wishes and on the District's exercise of standardless, unreviewable discretion that the child needs to be "protected from [his or her] own parents." DE 12, p. 19-20. This argument, however, is dangerously, and offensively, senseless.

## I.  The standard of review

To survive a Fed. R. Civ. P. 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678. The complaint need only provide the defendant with "fair notice" of the plaintiff's claim and the ground upon which it rests. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

Courts resolving Rule 12(b)(1) subject-matter jurisdiction challenges employ the same "plausibility" standard used to evaluate Rule 12(b)(6) motions to dismiss. *Silha v. ACT, Inc.*, 807 F.3d 169, 173-174 (7th Cir. 2015). Here too, the court should accept all well-pleaded facts alleged in the complaint as true and draw all reasonable

inferences in plaintiffs' favor. *Gociman v. Loyola Univ. Chi.*, 41 F.4th 873, 881 (7th Cir. 2022).

## II.   Plaintiff has standing

An organization has associational standing if: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017) (cleaned up). The Defendants concede that the Plaintiff seeks to protect interests germane to its stated purpose and that neither the claim asserted nor the relief requested requires individual member participation in the lawsuit. DE 12, p.7. However, they challenge whether the Plaintiff's members have standing in their own right absent allegations that the secret transition Policy has been applied to any of their children or otherwise "impacted (sic) the members." DE 12, p.7, 9.

### A.    Clapper does not control here

Defendants rely on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) to deny Plaintiff its day in court. However, *Clapper* does not control. First, the Defendants' Policy harms Plaintiff's members directly and concretely by providing an experimental and controversial form of psychological/psychosocial medical treatment ("social transition") with possible long-term and harmful impacts to a child without parental notice or consent; usurping parents' constitutionally-protected decision-making authority over this major decision; intentionally interfering in the parent-

7

child relationship by encouraging the child to keep secrets from their parents and to allow the child to live a "double life" at school and at home, damaging the bond of trust between parent and child; impairing their constitutional right to care for and educate their children; denying parents information necessary to exercise their constitutional right to determine if they want to continue to send their child to the District's public schools; and intentionally targeting religious parents as "unsupportive" and denying them notice or the opportunity to consent because of their religious beliefs. These are actual harms that are occurring now, not speculative harms that might occur at some indefinite point in the future.

Even if the above harms are viewed as future injuries, *Clapper* does not foreclose "any use whatsoever of future injuries to support Article III standing." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015). Indeed, *Clapper* itself, in a footnote, cautioned: "Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a "substantial risk" that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper,* 568 U.S. at 414 n.5. The Supreme Court has reiterated the point multiple times since. *E.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) (citing *Clapper,* 568 U.S. at 414 n.5) ("[A] person exposed to a risk of future harm may pursue forward-looking,

injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.").

Notably, the Supreme Court held that parents had standing to challenge a racially discriminatory admission policy, even though there was no guarantee that the policy would be applied to any particular child. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–720 (2007). The District argued the parents "can[not] claim an imminent injury," because they would "only be affected if their children seek to enroll in a Seattle public high school and choose an oversubscribed school that is integration positive," such that the racial tiebreaker was triggered. The Court brushed this argument aside as "unavailing." The Court emphasized, *first and foremost*, that the parents all "have children in the district's elementary, middle, and high schools," are subject to the policy, and therefore "*may be* 'denied admission to the high schools of their choice when they apply for those schools in the future,'" pursuant to the policy. *Id.* (emphasis added). The fact that "[some] children of group members will not be denied admission to a school based on their race—because they choose an undersubscribed school or an oversubscribed school in which their race is an advantage—does not eliminate the injury claimed." Rather, the injury was the violation of constitutional rights on the face of the Policy: "being forced to compete in a race-based system." This case has the same posture—Plaintiff's members all have children in District schools and are subject to a policy that, on its face, violates parents' constitutional rights.

The District's Policy also says, *explicitly and openly*, that the District will violate parents' constitutional rights in certain situations (whenever minors request secrecy from their parents), and the Supreme Court and other courts have recognized that a violation of constitutional rights is a serious harm in and of itself. *E.g.*, *TransUnion*, 141 S. Ct. at 2204 ("Various intangible harms can also be concrete … includ[ing] harms specified by the Constitution itself."); *Democratic Nat'l Comm. v. Bostelmann,* 451 F. Supp. 3d 952, 969 (W.D. Wis. 2020) ("The threatened loss of constitutional rights constitutes irreparable harm"); *see also Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) ("[W]hen constitutional rights are threatened or impaired, irreparable injury is presumed.").

These harms are unquestionably "imminent," especially given the District's Policy of secrecy from parents. Indeed, the District may well be *currently violating* some of Plaintiff's members' constitutional rights, without their awareness. Compl. ¶¶ 58–60, 82, 84, 97, 103, 114. It should go without saying that parents cannot know what the District is hiding from them. And since the District concedes that it will—solely at a minor's request—actively hide a constitutional violation from parents, the *only way* for parents to protect their children from "long-term damage," Compl. ¶ 61, and to preserve their constitutionally-protected decision-making authority with respect to their own children, is to challenge the District's Policy preemptively. Indeed, as the Court emphasized in *TransUnion*, the very purpose of "forward-looking, injunctive relief" (as is sought here), is to "prevent the harm from occurring." 141 S. Ct. at 2210.

Parents do not have to wait until their rights have been violated, and substantial harm done to their minor children, and then *hope* that they discover it, notwithstanding the District's Policy of secrecy. *See MedImmune*, 549 U.S. at 128–29 ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced.").

Plaintiff's members are in a unique position: if they cannot preemptively challenge the Policy, then they will be *required* to suffer the harm before they are capable of challenging the Policy because Defendants will hide the harm from them. In fact, under Defendants' theory, Plaintiff's member parents may never be able to challenge the harms imposed on them, provided that Defendant succeeds in keeping them in the dark. There are no like cases where a government entity adopts a policy that directs the government to violate a constitutional right of a citizen *and also* hide such violation from the citizen.

A few examples illustrate this point. Imagine that the school adopted a policy requiring school personnel to immediately administer a new experimental drug whenever a student is stung by a bee, and hides this fact from any parent who the employee suspects might object or be upset about the administration of the drug. No court would require parents to wait until the harm had been done to challenge such a policy. It is no different here: the District has a policy that if any student suffers from gender identity issues the school will immediately provide the experimental treatment of social transition and will not notify parents who it suspects would object.

11

Or take another example. What if a local police department adopted a policy to break in and search random community members' houses, while the owners were away, in an attempt to find and reduce drugs in the community, and then cover up the break in so victims would never know? Would members of that community also lack standing, unless they could first prove their house was broken into? Parents are not required by standing (or ripeness) to wait to bring suit to protect themselves against the imminently threatened harm targeting their constitutional rights.

The harm here is nowhere near as attenuated as in *Clapper*, but is much more analogous to *Remijas*. In that case, the plaintiffs all had their identity stolen through a hack that targeted the defendant. *Remijas*, 794 F.3d at 690, 693. Some plaintiffs suffered fraudulent charges, while a majority had not. *Id*. at 690. The Seventh Circuit questioned: Why would hackers break into the defendant's database and steal consumers' private information? Presumably, to make fraudulent charges or assume the stolen identities. *Id*. at 693. Thus, "it is plausible to infer that the plaintiffs have shown a substantial risk of harm from the [defendants'] data breach." *Id*.

Here, the same question could be asked: Why has the District adopted the Policy? One need only look to the District's brief for the answer: to enable children to secretly transition to a different gender identity at school, and to hide this from their "unsupportive" parents, solely at the child's request (as explained below, this is not sufficient to override parents' decision-making authority). The District would not have such a Policy, much less defend it in Court, unless it intended to apply it, and discovery will likely show that the District *is currently applying it*. In other words,

"[u]nlike in *Clapper*, the chain between Defendants' actions and [Plaintiff's members'] harm is hardly attenuated," *Barber v. Charter Twp. of Springfield, Michigan*, 31 F.4th 382, 391 (6th Cir. 2022)—the District says what it will do when this situation arises—it will violate parents' constitutional rights *and hide the violation from them*.

As in *Remijas*, where hackers targeted the defendant's customers, here Defendants' Policy targets Plaintiff's members and their children. Defendants' training on the Policy shows the District's intent to target "unsupportive" parents and teaches that "parents are not entitled to know their kids' identities." DE 1, ¶ 36. When a policy (or action) intentionally targets a specific group, it follows that the injury to that group becomes certainly impending and creates a substantial risk that the anticipated harm will occur because the goal of the Policy is to affect that group.

*Clapper* is simply not relatable to the facts in this case. Plaintiff's members' injury is not "speculative"; the District has *intentionally targeted* Plaintiff's members for the application of its Policy.

There is nothing "'conjectural" or "hypothetical" about the legal question here. The District says exactly what it will do with respect to student transitions. It will exclude parents from this major decision—and hide it from them—solely at a child's request (with input and influence from teachers and staff). In other words, it treats school like Las Vegas; "What happens at school stays at school." The question is whether that is constitutional. It is not.

Finally, the Plaintiff's members' injury is fairly traceable to the District's Policy—but for the Policy and actions of the District in its implementation, Plaintiff's

members would not be harmed. This Court can redress Plaintiff's members' injury through a favorable decision finding the District's Policy violates Plaintiff's members' constitutional rights and enjoining Defendants from continuing to enforce and implement it.

### B.    Plaintiff properly asserts a pre-enforcement claim

The Supreme Court has also recently recognized standing to bring pre-enforcement challenges to the threatened application of an unconstitutional statute, rule, or policy, in *Susan B. Anthony List*, which came after *Clapper*. 573 U.S. at 165 (citing *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) and *Steffel v. Thompson*, 415 U.S. 452 (1974). Indeed, it is axiomatic that persons who are subject to a government policy have standing to bring a pre-enforcement challenge provided that the plaintiffs face a credible threat of the policy's application, and the court can adequately evaluate the merits of the plaintiff's claim in a pre-enforcement posture. *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012); *see also Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati,* 822 F.2d 1390, 1394-95 (6th Cir. 1987). While these cases often involve a government-threatened penalty for exercising a constitutional right, the Court has applied the principle more broadly, including, for example, in a patent dispute between private parties. *E.g., MedImmune,* 549 U.S. 118.

To be clear, this case is a facial constitutional challenge to the Defendants' broad Policy implicating the most fundamental of all the liberty interests protected by the Due Process Clause—the right of Plaintiff's members to establish a home, raise

their children, direct their children's medical care, religious upbringing, and to control their education. DE 1, ¶¶ 77-88, 89-99, 118-126; *Troxel v. Granville*, 530 U.S. 57, 65 (2000). It is well-established that the class of plaintiffs eligible for standing includes all who are affected by the potential implementation of the challenged policy, since they suffer the vagaries of government discretion—benevolent or otherwise. *See Stokes v. City of Madison*, 930 F.2d 1163, 1168 (7th Cir. 1991) (citations omitted).

The present case is analogous to the *Susan B. Anthony List* line of cases in multiple ways. First, the rationale behind these cases is that individuals should not be put to the "choice between abandoning [their] rights or risking prosecution—[the kind of] dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *MedImmune*, 549 U.S. at 129. Here, the District's Policy puts parents to the same kind of impossible choice (especially given that the District will hide from parents when it violates their rights): parents must either withdraw their children from school, abandoning their right to a "free" public education (Wis. Const. art. X, § 3), or risk serious harm to their children and infringement of their parental rights. Parents should not have to "expose [themselves and their children] to [these serious harms] before bringing suit to challenge the basis for the threat." *Susan B. Anthony List*, 573 U.S. at 159 (quoting *MedImmune*, 549 U.S at 128–29).

Second, the District's Policy effectively punishes parents for "engag[ing] in a course of conduct arguably affected with a constitutional interest." *Susan B. Anthony List*, 573 U.S. at 160 (quoting *Babbitt*, 442 U.S. at 298). As alleged in the complaint, Plaintiff's members *would not* "immediately 'affirm' whatever beliefs their children

might have about their gender," and would not immediately "allow their young child[ren] to make a gender-role transition," but would instead first help them process what they are feeling and why, as many experts recommend, Compl. ¶¶ 51, 57, 92—a decision they have a right to make as parents. Yet this is the exact criteria the District uses to keep them in the dark and to determine if they are "unsupportive" of a transition. DE 12, p. 17, 24; DE 1, ¶¶ 37–44. In other words, the District punishes parents who would not agree to a transition by excluding them from the decision and hiding it from them. Worse yet, to avoid revealing a student's gender identity to "unsupportive parents," staff will have to engage in affirmative acts of deception, like using biological pronouns when parents are around, and "preferred" pronouns when they are not.

Third, the *Susan B. Anthony List* Court found "the threat of future enforcement . . . is substantial" based on a review of past enforcement. 573 U.S. at 164 (citing *Steffel*, 415 U.S. at 459). There is a history of policies like the District's being implemented and used against parents. *See Littlejohn v. School Board of Leon County, Florida*, Northern District of Florida, 4:21-cv-00415; *Konen v. Spreckels Union School District*, Superior Court of California, County of Monterey, Case No. 22-cv-001813; *Foote v. Town of Ludlow,* District Court of Massachusetts, Case No. 3:22-cv-30041; *Perez v. Clay County School Board,* Middle District of Florida, Case No. 3:22-cv-0083; *Ricard v. USD 475 Geary County Schools,* District Court of Kansas, Case No. 5:22-cv-04015 (the district court granted a preliminary injunction where a teacher was disciplined for refusing to comply with a policy similar to the District's

Policy and hide a student's social transition from parents); *T.F., et al. v. Kettle Moraine School District*, No. 21-CV-1650[2] (Waukesha Cnty. Wis., Cir. Ct., filed Nov. 17, 2021).

Finally, the Defendants admit that a showing of "substantial risk" that the Policy will be enforced in the way that the Plaintiff foresees is enough for standing. DE 12, p.10. They further admit that the secrecy Policy will be applied precisely as Plaintiff says: If a child struggling with gender confusion requests it, then the District's employees will hide her transition from her parents because "disclosure to parents should be considered in light of the totality of the circumstances in line with the goal of fostering an inclusive and welcoming environment…" DE 12, p. 17-18.[3] Therefore, the controlling authorities establish that the Plaintiff has standing to be

---

[2] Complaint available at: https://will-law.org/wp-content/uploads/2021/11/Kettle-Moraine-Complaint-Redacted.pdf

[3] In all other circumstances, the District recognizes that children cannot consent to medical treatment at school. That is why it has adopted Board Policy 453.4 titled "Administration of Medication to Students" mandating prior written parental consent before medication may be provided to students by school staff. Children cannot consent to treatment and hide the fact from their parents. For an abortion, parents are entitled to notice and are required to give consent. Wis. Stat. Ann. § 48.375. The only way around this is a judicial process to protect parents' constitutional rights through appropriate due process. Likewise, under both the PPRA and FERPA, the informational and privacy rights are held by parents until the student turns 18. 20 U.S.C. §§ 1232h(c)(5)(B), 1232g(d). Therefore, the notion that the District has the power and discretion to violate parents' constitutional right to know about their child's gender transition if the child requests it but lacks the power and discretion to provide that same child with a dose of cold medicine or a simple antibiotic under any circumstances absent prior parental notice and written consent, seems impossibly absurd. But this is the District's stance.

heard. *See Susan B. Anthony List,* 573 U.S. at 159; *MedImmune,* 549 U.S. at 128–29; *see also Talberg*, 2020 WL 6375396, at *4.

### C. Plaintiff has standing because Defendants' Policy denies parents information that they need to exercise their constitutional rights

Plaintiff's members have the constitutional right to place or remove their children from public school. *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925). Plaintiff's members will not immediately "affirm" whatever beliefs their children might have about their gender. DE 1, ¶ 92. However, the District's Policy denies parents information they need to direct the upbringing of their children and decide if they want to keep their children in public school. The District's denial of information to Plaintiff's members deprives them of the information necessary for them to exercise their constitutional rights. As such, this constitutes an injury-in-fact for standing purposes, as Plaintiff's members are currently deprived of this right. It is not a future harm, it is a current, ongoing harm.

Plaintiff's members do not have the ability to exercise their constitutional decision-making authority because of the District's Policy. When government action makes the exercise of a Constitutional right impossible or nearly so, that alone constitutes a violation of the right. *See e.g., Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("The Second Amendment . . . does not explicitly protect ammunition. Nevertheless, without bullets, the right to bear arms would be meaningless. . . . Thus the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them.") (cleaned up). The

same principle applies here, because parents have a right to direct the upbringing of their children, intentionally hiding information from parents to prevent them from making informed choices violates that right. If Constitutional rights are to mean anything at all, the Courts cannot allow them to be so easily circumvented. DE 12, p. 18.

Importantly, Plaintiff's members have no way to even *obtain the information necessary* to exercise their constitutional right. It is the District's Policy, admitted in their Memorandum, to actively hide this information from parents if the child requests it. At that point, unless someone accidentally tells the parents, it would be virtually impossible for parents to ever discover.[4] Such a denial of critical information prevents Plaintiff's members from exercising their constitutional rights. This is sufficient to satisfy standing's "injury in fact" requirement.

### D. Plaintiff has standing because the District's Policy is an unconstitutional condition preventing parents from exercising their constitutional rights

The unconstitutional condition doctrine provides another injury for standing purposes. A generally available public benefit (in this case, a public-school education) cannot be conditioned on surrendering a constitutionally protected right (in this case, the right of parents to the care, custody, and control of their children, including the right to determine medical treatments, and to maintaining a positive parent-child relationship without state interference). "For at least a quarter-century, this Court

---

[4] Likewise, are concerned parents supposed to request their child's Gender Support Plan daily to try and learn if one is present?

has made clear that, even though a person has no 'right' to a valuable government benefit, . . . [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . . Such interference with constitutional rights is impermissible." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also Carson v. Makin,* 142 S. Ct. 1987 (2022) (holding that a receipt of a generally applicable benefit cannot be conditioned on a school surrendering the right to exercise its religion as it sees fit.)

The District's Policy is applicable to all students in the school district, including Plaintiff's members' children. Plaintiff alleges the Policy denies parents their parental rights in multiple ways, including denying parents the right to the care, custody, and control of their children, denying parents the right to make medical decisions for their children, and constitutes intentional interference with the parent-child relationship. Requiring acceptance of such a condition for parents to access this generally available public benefit violates the unconstitutional condition doctrine. Such a violation is sufficient for the Plaintiff's members to have suffered an injury-in-fact and satisfies standing's requirements.

### E.    Plaintiff has informational standing

The District receives federal funds. DE 1, ¶ 120. Accordingly, it is subject to 20 U.S.C. § 1232h (Protection of Pupil Rights Amendment or "PPRA") and its implementing regulations, including 34 C.F.R. § 98.4(a). Section 1232h(b) provides in relevant part that no student shall be required to submit to a survey, analysis, or evaluation that reveals, *inter alia*, information concerning mental or psychological

problems of the student or the student's family; sex behavior or attitudes; or critical appraisals of other individuals with whom respondents have close family relationships without prior parental notice and consent. *See* 20 U.S.C. §§ 1232h(b)(2), (3), (5). This describes exactly what occurs when the District requires students to complete a Gender Support Plan with school staff. DE 1, ¶¶ 3, 23-33.

34 CFR § 98.4 provides that no student shall be required to submit without prior parental consent to a psychiatric or psychological examination, testing, or treatment in which the primary purpose is to reveal information concerning sex behaviors and attitudes. A "Psychiatric or psychological examination or test" is defined as a method of obtaining information "that is not directly related to academic instruction and that is designed to elicit information about attitudes, habits, traits, opinions, beliefs or feelings." 34 CFR § 98.4(c)(1). This describes exactly what occurs when the District requires students to complete a Gender Support Plan with school staff. "Psychiatric or psychological treatment" is defined as "an activity involving the planned, systematic use of methods or techniques that are not directly related to academic instruction and that is (sic) designed to affect behavioral, emotional, or attitudinal characteristics of an individual or group." 34 CFR § 98.4(c)(2). This describes exactly the District's social transition measures.

The injury in fact that the Plaintiff's members have suffered flows from the Defendants' promise that it will deny them information about their children that the PPRA requires the District to disclose. *Fed. Election Comm'n v. Akins*, 524 U.S. 11,

21 (1998). The fact that other parents might make the same complaint does not lessen the member parents' injury. *Id.* at 24.

Additionally, the Plaintiff's members have a constitutional right to remove their children from public school. *Pierce*, 268 U.S. 510. Accordingly, they are targeted by the District's secrecy Policy for information denial. In fact, if the District Policy stands then they have no way to even *obtain the information necessary* to exercise their rights. This too is an injury in fact.

## III.   Plaintiff's claims are actionable and should not be dismissed

Plaintiff has stated a claim for a violation of its members' constitutional substantive due process parental rights, free-exercise rights, and statutory rights. DE 1, ¶¶ 77-88, 89-99, 118-126.

### A.   The Defendants' Policy violates substantive due process

A parent's constitutional right to raise her child is beyond dispute. The Defendants narrowly frame the fundamental right at issue in this case as the right "to be promptly informed of their child's gender identity if it differs from the gender associated with their sex assigned at birth, regardless of their child's wishes or any concerns regarding the detrimental effect the disclosure may have on the child." DE 12, p. 16.[5] But this is hardly the whole story—Plaintiff's members assert the right to be involved in the *decision* about whether staff will treat *their* child as the opposite

---

[5] Defendants' argument from page 11-15 attacks a strawman that is not at issue in this case, namely that parents do not have a substantive due process right to control a school's curriculum. Plaintiff did not bring this lawsuit as a challenge to any curriculum.

sex while at school—which many experts believe is not in the best interests of children struggling with this. The purpose and effect of the Defendants' Policy is to reach beyond the schoolhouse gates to keep students who wish to exhibit as "transgender" at school "safe" at home from parents who might be "unsupportive" (however defined). In other words, the District usurps the parent's role on the pretext that a child is at risk, effectively branding such parents as abusive without any due process protections at all. This is forbidden by the Fourteenth Amendment.

### 1. Parents, not public schools, are entitled to make life-altering decisions for their children

*Parham v. J. R.*, 442 U.S. 584 (1979) should control here. In *Parham*, the Court found that parents, not children, must make medical care and treatment decisions for their children because children lack the experience and maturity to do so themselves. *Id.* at 602. The Supreme Court has long protected parental rights as a fundamental liberty interest, starting with *Meyer v. Nebraska*, and has consistently recognized the fundamental right of parents to direct the welfare, education, care, custody, control, upbringing, and the protection of the parent-child relationship. 262 U.S. 390 (1923) (holding that a state statute barring parents from teaching German to their children violated parents' fundamental rights.) This liberty interest is protected by the Due Process Clause of the Fourteenth Amendment and was long established in the common law. *See generally*, Wm. Blackstone, *Commentaries on the Law of England*, Book the First, ch. XVI, at *447, *450, https://oll.libertyfund.org/titles/blackstone-commentaries-on-the-laws-of-england-in-four-books-vol-1.

The Fourteenth Amendment "forbids the government to infringe . . . 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). The Supreme Court has already found that parental rights are "deeply rooted in this Nation's history and traditions" and that they are "implicit in the concept of ordered liberty." *Id.* at 720-21.

The Supreme Court has expansively understood this fundamental right and its application. In *Pierce v. Society of Sisters*, the Supreme Court held that a state law *requiring* compulsory public-school education was unconstitutional because it violated parents' fundamental rights to make decisions concerning their children. 268 U.S. 510, 534-35 (1925) ("[W]e think it entirely plain that the Act of 1922 [compelling public school education] unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control."). As the Court explained, the "child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 535. The Court continued in *Prince v. Massachusetts*, finding that the right and obligations of "custody, care, and nurtur[ing]" of a child first resides in the parents, and that parents have the "primary function and freedom" to prepare their children "for obligations the state can neither supply nor hinder." 321 U.S. 158, 166 (1944). As the Court concluded: "[I]t is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter." *Id.*

And it is not just the ability to direct a child's education that the Court has weighed in on. Parents also have a right to "the companionship, care, custody, and management of his or her children," *Stanley v. Illinois*, 405 U.S. 645, 651, (1972), and that this right is "far more precious to [the mother] than property rights." *May v. Anderson*, 345 U.S. 528, 533 (1953). Parents are entitled to due process before their parental rights are overridden by the state. *Stanley*, 405 U.S. 645; *May*, 345 U.S. 528.

Additionally, the Court has stated the relationship between parent and child is also protected as part of a parent's fundamental due process right. "We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected." *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 231–233, (1972); *Stanley*, 405 U.S. 645; *Meyer v. Nebraska*, 262 U.S. at 399-401). The Court went on to state that "it is now firmly established that "freedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Quilloin*, 434 U.S. at 255 (quoting *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639 (1974)).

The Seventh Circuit has likewise recognized that "the Fourteenth Amendment prohibits the government from interfering in the familial relationship unless the government adheres to the requirements of procedural and substantive due process." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1019 (7th Cir. 2000). The Fourth Circuit recognized the importance of the familial relationship in *Jordan by Jordan v. Jackson*: "Through the intimate relationships of the family, our children are

25

nurtured, tutored in the values and beliefs of our society, and prepared for life. Through these relationships, our children—indeed, we, as parents—are strengthened, fulfilled and sustained. The bonds between parent and child are, in a word, sacrosanct, and the relationship between parent and child inviolable except for the most compelling reasons." 15 F.3d 333, 342-343 (4th Cir. 1994) (citations omitted).

In another Seventh Circuit case, the court explained that the Supreme Court used "sweeping language" when describing the fundamental constitutional liberty interest parents have "in the care, custody, and control of their children." *Doe v. Heck*, 327 F.3d 492, 519 (7th Cir. 2003) (citing *Troxel*, 530 U.S. at 65). The Seventh Circuit explained that the "Supreme Court has long recognized, as a component of 'substantive' due process, that parents have a liberty interest in familial relations, which includes the right to 'establish a home and bring up children' and 'to control the education of their own.'" *Id*. at 518 (quoting *Meyer*, 262 U.S. at 399). The court ultimately concluded, as it relates to the familial relations claim, that the state "not only failed to presume that the plaintiff parents would act in the best interest of their children, they assumed the exact opposite, that the parents might be complicit in any abuse. . . By doing so, the defendants . . . disregarded the constitutional presumption 'that fit parents act in the best interests of their children.'" *Id*. at 521-22.

"Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. As the Court explained: "The law's concept of the family rests on a presumption that parents

possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Id*. at 602.

In *Parham*, the appellees, the children, were arguing that Georgia's statute which allowed parents to voluntarily admit their children to mental hospitals violated the child's procedural due process rights and that they were entitled to a "formal, adversary, pre-admission hearing." *Id*. However, the Court disagreed, stating that the same thing could apply to "a tonsillectomy, appendectomy, or other medical procedure." *Id*. "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Id*. Parents, not children, have the fundamental right to make medical decisions and provide consent. Parents have this authority because "there is a presumption that fit parents act in the best interests of their children," *Troxel*, 530 at 68, and because children lack the maturity, experience, and capacity for judgment necessary to make the decision, *Parham*, 442 U.S. at 603.

Defendants' analysis of the fundamental interest at issue and level of scrutiny is incorrect. The Supreme Court has already decided the question: Plaintiff's members have a fundamental parental right which includes: the "right to make decisions concerning the rearing of [their children]," *Troxel*, 530 U.S. at 68; the right to the companionship, care, custody, and control of their children, *Stanley*, 405 U.S.

at 651; *Troxel*, 530 U.S. at 66; the right to maintain the parent-child relationship free from governmental interference without due process, *Quillion*, 434 at 255; and the right to make decisions, and specifically medical decisions, for their children, *Parham*, 442 U.S. at 602-603. Strict scrutiny is appropriate here. *Glucksberg*, 521 U.S. at 721; *Troxel*, 530 U.S. at 80 (Thomas, J., concurrence) ("I would apply strict scrutiny to infringements of fundamental rights.").

In accordance with these principles, courts have recognized that a school violates parents' constitutional rights if it attempts to usurp their role in significant decisions. *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) (where a high-school swim coach suspected that a team member was pregnant but failed to notify the parents, the court found that the mother had alleged a constitutional violation and condemned the coach's "arrogation of the parental role"). "It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights." *Id*. at 306–07. There are few decisions more significant than a parent's decision to decide what medical treatment is most appropriate for the long-term health of their child. This decision is squarely with the parents and the Defendants here cannot act to usurp that authority. *Parham*, 442 at 603.

Plaintiff easily meets the notice pleading requirements needed to satisfy its § 1983 claim related to the Defendants' violation of the Plaintiff's members' parental rights. Plaintiff alleges that the District Policy allows children to socially transition at school, a psychosocial/psychological medical treatment, without parental notice or

consent. The Policy encourages children to keep secrets from their parents if they fear their parents will not be "supportive." As the training for the Policy states: Parents "are not entitled to know their kids' identities." This has created a culture where teachers now tell students "If your parents aren't accepting of your identity, I'm your mom now." The District is arguing that it has the right to make life altering decisions for children, without regard to their parents' wishes, especially "unsupportive" parents, and that it has the right to teach children to keep secrets about sexual behavior from their parents. This presumes the parents are unfit without any due process protection for the parent's fundamental rights, a judgment that the Seventh Circuit has already condemned in *Doe v. Heck*. 327 F.3d at 521. The District's Policy, training, and the actions these have generated clearly violate parents' fundamental rights to the companionship, care, custody, control, relationship, and decision-making authority secured through the Fourteenth Amendment to the United States Constitution. Plaintiff's claim in Count 1 should not be dismissed.

### 2. Defendants fail to state either a compelling interest or legitimate interest that is rationally related to their Policy

#### a) Defendants fail even rational basis review

Plaintiff maintains its contention that strict scrutiny should apply. Even so, Defendants fail to satisfy even rational basis review. Defendants assert that they have a legitimate interest in fostering "inclusive and welcoming environments that are free from discrimination, harassment, and bullying regardless of sex, sexual orientation, gender identity or gender expression" and that the Policy is "rationally

related" to achieving that result. DE 12, p. 20. But the portion of the District's Policy challenged by Plaintiff is not rationally related to the Defendants' claimed interests.

Further, if the school truly thought a child was in imminent danger from their parents, there is already a system in place to address those rare situations involving "imminent safety risks" from parents, namely, the Wisconsin's Child Protective Services program. *See generally*, Wisconsin Department of Children and Families, *Wisconsin       Child       Protective       Services       (CPS)       Process*, https://dcf.wisconsin.gov/cps/process. Indeed, the CPS statutes already allow local law enforcement to "take any necessary action" if there is "reason to believe that the health or safety of [a] child . . . is in immediate danger," Wis. Stat. § 48.981(3)(b)(1), and teachers and other school staff are mandated CPS reporters, Wis. Stat. § 48.981(2)(a)(14)–(16). But, unlike the District's Policy, the CPS process complies with constitutional substantive and procedural due process requirements and sets a high standard for displacing parents ("abuse or neglect"), *id*. § 48.981(2), and provides robust procedural protections, such as notice and a hearing and, ultimately, court review. *E.g.*, Wis. Stat. §§ 48.981(3)(c); 48.13; 48.27; 48.30.

The District is presuming, without any basis, that parents are acting as abusers if they do not immediately affirm their gender confused child. Such a presumption is impermissible.

The Seventh Circuit in *Doe v. Heck*, recognized that parents are constitutionally presumed to act in the best interest of their children. 327 F.3d at 522 (citing *Troxel*, 530 U.S. at 68). But in *Heck*, the state *presumed* the parents were

30

complicit in abuse instead of presuming parents act in the best interest of their children. *Id.* The Seventh Circuit found that the state violated the parents' fundamental due process rights in the upbringing and education of their children. *Id.* at 524. The court held:

> because the defendants had no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children, or that they were complicit in any such abuse, **the defendants violated the plaintiffs' right to familial relations by conducting a custodial interview of John Doe Jr. without notifying or obtaining the consent of his parents** and by targeting the plaintiff parents as child abusers.

*Id.* (emphasis added). Similarly, in *Brokaw*, the Seventh Circuit held that "a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." 235 F.3d at 1019. Defendants point to no evidence that parents who are not immediately affirming of their child's gender social transition are abusive, yet their Policy treats such parents as presumptive abusers. Defendants' stated legitimate interest is not rationally related to its Policy and it impermissibly labels parents who disagree with the Defendants' preferred treatment option as abusers.

### b) Defendants' claimed compelling interests are simply a repudiation of parents' fundamental rights and cannot support Defendants' Policy

The Defendants also argue they have a compelling interest in "protecting student privacy"; "protecting students' safety and ensuring a safe, welcoming school environment where students . . . feel accepted and valued"; and "not discriminating

31

against transgender and gender nonconforming students." DE 12, p. 20. To show a compelling interest, the Defendants are required to identify particular, specific interests and the harm that will be caused if they cannot maintain their Policy. Yet they only identify broad, general interests.

In *Wisconsin v. Yoder*, the Supreme Court held that Wisconsin's statute criminalizing parents for removing their children from compulsory high school education was unconstitutional as applied to the Amish. 406 U.S. 205, 235-236 (1972). The State argued that "its interest in its system of compulsory education is so compelling that even the established religious practices of the Amish must give way." *Id.* at 221. However, the Court disagreed, finding that the Amish presented evidence demonstrating they continue with a mode of informal education, and that the State had to show "more particularly how its admittedly strong interest in compulsory education" would be harmed by granting the Amish an exemption. *Id.* at 236. The State's failure to show particular harm was fatal.

Likewise, in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006), the Court acknowledged that RFRA "expressly adopted the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, (1972)." (citations cleaned up). The Court found that in both of those cases, "this Court looked beyond broadly formulated interests justifying the general applicability of government mandates and scrutinized the asserted harm of granting specific exemptions to particular religious claimants." *Id.* The Court went on to point out that the rule requiring particularity applies broadly

when any fundamental rights are involved: "Outside the Free Exercise area as well, the Court has noted that '[c]ontext matters' in applying the compelling interest test, . . . and has emphasized that 'strict scrutiny *does* take '"relevant difference"' into account"—indeed, that is its fundamental purpose."' *Id*. at 431-32 (quoting *Grutter v. Bollinger,* 539 U.S. 306, 327 (2003) and *Adarand Constructors, Inc. v. Peña,* 515 U.S. 200, 228 (1995)). Applying this principle, in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726-727 (2014), the Supreme Court, when considering a compelling interest, rejected HHS's broad articulation of interests such as generally promoting "public health" and "gender equality," instead requiring a focus on the interests served by the particular application to plaintiffs.

Applying these principles here, it is not "protecting student privacy," but rather an asserted right for the Defendants to help children keep information private *from their own parents*. It is not just "student safety" in a school environment but an assertion by Defendants that parents who disagree with their preferred course of treatment are not "safe" and would presumptively abuse their own children. It is not preventing "discrimination of transgender and gender nonconforming students," but rather that Defendants assert an interest in preventing parents from seeking alternative medical treatments besides the Defendants' preferred treatment. However, even these more specific interests are not relevant to the *parents' decision* regarding how to treat their own child and they do not impact the students' privacy from third parties, safety of the school, or whether the school discriminates against

transgender individuals. These interests are simply not applicable to the rights the parents are asserting.

Finally, these asserted "compelling interests" are nothing more than statements that the school might disagree with the parents' choices related to their own children. However, there is a presumption that parents act in the best interest of their children and are responsible for making decisions for their children because children do not have the maturity necessary to make life's difficult decisions. *Troxel*, 530 U.S. at 68; *Parham*, 442 U.S. at 602; *Brokaw*, 235 F.3d at 1019 (requiring definite and articulable evidence giving rise to suspicion parents were abusive or may become abusive). Even WPATH recommends that *professionals,* much less school personnel, should defer to parents when deciding if their young children should socially transition. DE 1, ¶ 64.

> The district court in *Ricard* applied this teaching directly in this context:
>
> Presumably, the [school] District may be concerned that some parents are unsupportive of their child's desire to be referred to by a name other than their legal name. Or the District may be concerned that some parents will be unsupportive, if not contest, the use of pronouns for their child that the parent views as discordant with a child's biological sex. But this merely proves the point that the District's claimed interest is an impermissible one because it is intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit. And whether the District likes it or not, that constitutional right includes the right of a parent to have an opinion and to have a say in what a minor child is called and by what pronouns they are referred.

*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 5:22-CV-04015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022). These "compelling interests" are Defendants' attempts

to justify displacing parents as the ones primarily responsible for the care, custody, and upbringing of children in violation of Plaintiff's members' fundamental rights.

### (1)   Minors have no privacy interest as to their parents

Defendants state "protecting student privacy" is a compelling interest, but if the interest is to apply in this case, they must mean that students have a privacy right *against the student's own parents* without evidence that the child is being abused. In context, this means withholding a child's transgender status from the child's own parents. As an initial matter, what privacy interest is the school claiming to protect? If the child is identifying at school as the opposite sex, using an alternate name and opposite-sex intimate facilities, they are doing so publicly and openly, by definition, and there can be no privacy interest to protect.

Beyond this threshold issue however, children have no privacy interest against their parents, and they cannot manufacture such a right by disclosing matters first to school personnel. As the Fifth Circuit noted in a related context, it "has never held that a person has a constitutionally-protected privacy interest in her sexual orientation, and it certainly has never suggested that such a privacy interest precludes school authorities from discussing with parents matters that relate to the interests of their children." *Wyatt v. Fletcher*, 718 F.3d 496, 505 (5th Cir. 2013); *see also Doe v. Gray*, No. 3:20-CV-129, 2022 WL 602919, *5 (N.D. Ind. Mar. 1, 2022) (finding that "this generalized trend toward recognizing rights for same-sex relationships is not tailored to the disclosure of private information" and granting qualified immunity for the disclosure of plaintiff's transgender status).

Most importantly, the idea that minor children have a protectable right to keep secrets from their parents runs directly counter to the firmly established principles that parents have the right to make important decisions for their children because children are not capable of making decisions in their own best interests due to their immaturity, *Parham*, 442 U.S. at 602; *Troxel*, 530 U.S. at 68-69; *Stanley v. Illinois*, 405 U.S. at 651; and the statutory schemes granting parents rights to their children's information shows that children lack a privacy interest against parents, Wis. Stat. § 118.125(2)(a), (b); 20 U.S.C. § 1232g(a)(1)(A) (education records); Wis. Stat. §§ 146.81(5); 146.82(1); 146.83(1c); 45 CFR § 164.502(c) (medical records).

Defendants acknowledge the rights of parents in the Policy itself, where it states that Gender Support Plans will be available to parents upon request pursuant to the Family Education Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"). The Policy itself finds that "student privacy" is not a compelling interest as that Policy requires disclosure. However, this disclosure comes *after* the injury has already occurred and after the school has usurped the parental role without notice or consent. Further, nothing prevents the school from simply moving forward with a child's social transition without a written Gender Support Plan—the Policy does not require a Gender Support Plan before staff will begin addressing a child using opposite-sex name and pronouns.

The Policy hides information from parents because the Defendants wish to prevent parents from exercising their constitutional rights. The Defendants believe they know better, and so they have chosen to usurp the parents' role and undermine

their authority. Indeed, in *Parham*, the Court described the idea that government should preemptively protect children from their own parents—which mirrors Defendants' argument—as "statist" and "repugnant to American tradition." 442 U.S. at 603; *see also Doe v. Heck*, 327 F.3d at 521 (finding a violation of parents' right when State actors "not only failed to presume that the plaintiff parents would act in the best interest of their children, they assumed the exact opposite."). Absent clear evidence of abuse, this is unlawful. *Parham*, 442 U.S. at 603-604.

Parents are principally responsible for their minor children, even in public school, and the law presumes parents act in their children's best interest. The law grants parents these extensive rights because children are not yet fit to make decisions for themselves, thus eliminating any "privacy" interest a child might have against their parents. Instead of acknowledging these legally and constitutionally required presumptions and rights, the Policy acts to deny parents the information necessary for them to make informed decisions for their children. And Defendants claim this denial is in service of a compelling interest. Hardly. It is, instead, a repudiation of the fundamental parental right and cannot be a compelling interest.

> **(2)    Defendants cannot rely on "safety" as a compelling interest as applied to the child's parents, as that rests on the assumption that all parents who do not support the District's preferred course of treatment are abusive**

Defendants rely on "safety" as a compelling interest. As argued above, this must mean the District aims to protect children from their own parents because the Defendants are withholding the information *from the parents*, not from the school

administrators. Even if the Defendants presented some evidence, which it has not, that some parents who were not supportive were also abusive, this still could not be a compelling interest. That is because parents' fundamental rights may not be foreclosed without notice and due process. If the school could show abuse, which it has not even attempted to do, the solution would not be to lie to parents and keep them in the dark, but rather to involve the Wisconsin Department of Children and Families, as discussed above. This route would provide notice and due process, giving parents the ability to protect their parental rights and prerogatives, while also protecting the child.

The Supreme Court has repeatedly required notice and due process in parental rights settings. For example, in *Santosky v. Kramer,* the Court held that the State must find that a parent is guilty of neglect by clear and convincing evidence, 455 U.S. 745, 747-748 (1982); and in *Stanley*, the Court held that due process requires a natural parent to be given a hearing prior to a determination of neglect. 405 U.S. at 656-58. The Supreme Court has summarized, "The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Parham*, 442 U.S. at 603 (emphasis in original); *see also In re Winship*, 397 U.S. 358, 365-66 (1970) (remarking that "labels and good intentions do not themselves obviate" due process safeguards). Notice and due process are required before the deprivation of parents' fundamental liberty interest in the care of their children. Their fundamental liberty interest cannot be eliminated in secret. *Brokaw*, 235 F.3d at 1019 (finding that "courts have

38

recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse") (citing *Croft*, 103 F.3d at 1126).

Additionally, it is unclear how the Defendants even determine if parents are or will be supportive. It appears they rely solely on the child's evaluation. However, this determination method is too vague to pass constitutional analysis. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (holding that a "more stringent vagueness test should apply" when the measure "threatens to inhibit the exercise of constitutionally protected rights"). Such standardless discretion provides a "convenient tool for harsh and discriminatory enforcement" by the government decision makers "against particular groups deemed to merit their displeasure." *Papachristou v. Jacksonville,* 405 U.S. 156, 170 (1972) (finding "suspicious" to be vague and quoting *Thornhill v. Ala.,* 310 U.S. 88, 97-98 (1940)).

The District does not have power to act as an ad hoc family court, litigating family law issues or deciding on their own, independent of any court process, which parents have authority over which decisions.

Defendants point to the Policy's language that "School staff, family, and the student" should work to complete the Gender Support Plan together. However, as the Defendants have made clear, if the child does not want his or her parents notified, the school will withhold notification. DE 12, pp. 3, 17. The Policy itself states some "transgender, non-binary, and/or gender-nonconforming students are not 'open' at

home for reasons that may include safety concerns or lack of acceptance. School personnel should speak with the student first before discussing the student's gender nonconformity or transgender status with the student's parent/guardian." DE 1-3, p. 2. If parents are not deemed "safe" or "supportive" then the school will not inform the child's parents. DE 1, ¶ 32; DE 1-3, p. 2; DE 12, pp. 3, 17.

The law presumes that it is *parents* that know their own children best and who are best positioned and motivated to protect and counsel them. *See Parham*, 442 U.S. at 602. It is *parents* who are given the primary right to care for their child—not school counselors, teachers, or principals. *See Troxel,* 530 U.S. at 66 ("it cannot . . . be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *Stanley*, 405 U.S. at 651 ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder") (quoting *Prince*, 321 U.S. at 166).

Parents' rights, like other fundamental Constitutional rights, may only be abridged after notice and due process. Neither has been provided here. This cannot be a compelling interest supporting Defendants' Policy.

> **(3) A generalized interest in preventing discrimination against transgender individuals has no Constitutional effect**

This suit challenges the Defendants' targeting of parents whom the Defendants believe have not "earned the right" to know about the health and

psychiatric problems facing their own children. The Defendants argue that federal law protects transgender individuals from discrimination, and thus they have the right to infringe parents' rights to care for and raise their child. Whether the Defendants' claim about federal law is true or not has no Constitutional relevance here. Absent a finding of abuse in accordance with applicable laws, the Defendants do not have the power to dictate how Plaintiff's member *parents* treat or instruct their children, even if the education bureaucrats disagree with the parents' religious beliefs or choices. And they certainly do not have the authority to mislead moms and dads about their own children. Finally, this "interest" is not rationally related to the Defendant's Policy.

**B.      Plaintiff states a free-exercise claim that the District's Policy interferes with their religious rights to raise their children, freely exercise their religion, and teach that religion to their children**

Defendants assert, without argument, that Plaintiff has failed to state a claim for violations of Plaintiff's member's free exercise rights. Instead, Defendants focus on the fact that they meet rational basis review and that the Policy is rationally related to Defendants' interest in fostering an inclusive and welcoming environment for transgender students that is free from discrimination. However, Defendants claimed interest in creating "an inclusive and welcoming environment" is not rationally related to Defendants' Policy that denies a parent's rights or socially transitions a parent's child without parental consent. DE 1-3. Further, rational basis

review is not appropriate for this claim because of Defendants' intolerant views of some religious beliefs and people.

### 1. The District's Policy is not a law of neutral and general applicability because it is hostile to religious parents

Plaintiff has stated a valid first amendment challenge. "The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1876 (2021). The fundamental principle of the free-exercise clause is that the Constitution "commits government itself to religious tolerance[.]" *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018). "Thus, laws that burden religious exercise are presumptively unconstitutional unless they are both neutral and generally applicable." *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021) (citing *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877–78, (1990)). A law failing neutrality and general applicability must be "justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993).

"To determine whether a law is neutral, courts must look beyond the text and scrutinize the history, context, and application of a challenged law." *Meriwether*, 992 F.3d at 512 (citing *Masterpiece*, 138 S. Ct. at 1731; *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 534). "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious

nature." *Fulton,* 141 S. Ct. at 1877. As the Supreme Court in *Church of the Lukumi Babalu Aye, Inc.* stated:

> Facial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause "forbids subtle departures from neutrality," *Gillette v. United States,* 401 U.S. 437, 452 (1971), and "covert suppression of particular religious beliefs," *Bowen v. Roy, supra,* 476 U.S., at 703 (opinion of Burger, C.J.). Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt. "The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Walz v. Tax Comm'n of New York City,* 397 U.S. 664, 696 (1970) (Harlan, J., concurring).

508 U.S. at 534 (cleaned up).

As Plaintiff's Complaint alleges, Defendants' training on its Policy is overtly antagonistic toward religious parents. DE 1, ¶ 37. The facilitator notes remind the facilitator that while parents' objections to the "LGBTQIA+" agenda will likely be from religious parents, not all religion is the problem. Instead, it is the "weaponization of religion against queer people" that is the problem. DE 1, ¶ 37.

Noting that all religion is not the problem does not save Defendants here. A policy that targets only "some religion" is not saved by that fact, instead it adds an equal protection violation to the already extant free exercise violation, by picking and choosing between the holders of particular religious beliefs. In Defendant's attempt to defend its Policy, it has merely admitted to an additional constitutional violation. *See Center for Inquiry, Inc., v. Marion County Court Clerk*, 758 F.3d 869 (2014). In substance, Defendants attempt to argue that the Policy is acceptable because it proclaims that "not all religions are equally bigoted." This is a shocking argument,

both in what it reveals about the District's biases, and in how badly it misinterprets the law of this nation and this Circuit.

During the online training session entitled "Safe Spaces Part Two," Christopher Jorgenson states: "We understand and acknowledge that teachers are often put in terrible positions caught between parents and their students. But much like we wouldn't act as stand-ins for abuse in other circumstances, we cannot let parents' rejection of their children guide teachers' reactions and actions and advocacy for our students." He continues reading from the slide which states: "Religion is not the problem. Discrimination is the problem. Bigotry as ideology is the problem. The weaponization of religious beliefs against marginalized people is the problem." DE 1, ¶ 38. This same training states: "We handle religious objections too often with kid gloves . . ." and that if the parents have a "faith-based rejection of their student's queer identity" then the school staff "must not act as stand-ins for oppressive ideas/behaviors/attitudes, even and especially if that oppression is coming from parents." DE 1, ¶ 39. The Complaint alleges that the training teaches that religious parents who are not affirming of their child's social transition or gender identity are abusing their children, are "oppressive," and not supportive of their own children. DE 1, ¶ 40.

Such open hostility toward religious, faith-based parents prevents the Policy from being "neutral" and "generally applicable." *Masterpiece Cakeshop*, 138 S.Ct. at 1732. This fails to account for religious parents "in a way consistent with the requisite religious neutrality that must be strictly observed." *Masterpiece Cakeshop*, 138 S.Ct.

at 1732. Because Defendants' Policy is not neutral or generally applicable, it must be justified by "a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531. Defendants do not even argue the Policy has a compelling interest as related to Plaintiff's religious freedom claim. Even so, it fails for substantially the same reasons as articulated above for the substantive due process claim.

### C.    Plaintiff states a § 1983 claim for Defendants' PPRA violations

Section 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities" secured by the federal Constitution and laws. This section safeguards, *inter alia*, rights conferred by federal statutes. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Maine v. Thiboutot,* 448 U.S. 1, 4 (1980).

To obtain § 1983 redress, "a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law." Blessing*, 520 U.S. at 340. A three-factor test applies: First, Congress must have intended that the provision in question benefit the plaintiff. Second, the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement strains judicial competence. Third, the statute must unambiguously impose a binding obligation on a State or local government. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms. *Id.* at 340-41 (citations omitted). If a plaintiff demonstrates that a statute confers an individual right, then that right is

presumptively enforceable through § 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002).

### 1.     PPRA creates rights for individual parents and students

The PPRA was enacted to benefit individual parents and students, codifying their rights to obtain information and opt out of specified public school activities. Without textual analysis, the Defendants claim Congress granted parents no rights in the PPRA. *See* DE 12, p. 33 ("There is nothing in the statute or regulations that confer [*sic*] a specific federal right to" parents). This claim, however, contradicts the plain text and is unsupportable. *See, e.g.,* 20 U.S.C. §§ 1232h(a); (b); (c)(1)(A)(i); (c)(2); (c)(5)(B); (d); (f); 34 CFR § 98.4; U.S. Dep't of Edu., Student Privacy Policy Office, *Protection of Pupil Rights Amendment* (PPRA), SPPO-21-01 (Nov. 24, 2020), https://studentprivacy.ed.gov/sites/default/files/resource_document/file/20-0379.PPRA_508_0.pdf; *infra*, Section II(E).

Statutory text, title, and agency guidance demonstrate that these rights are couched in mandatory, not precatory terms. By contrast, the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g, entirely lacks this sort of "rights-creating" language critical to showing the requisite congressional intent. FERPA's provisions speak only to the Secretary of Education, directing that "[n]o funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice." 20 U.S.C. § 1232g(b)(1). The PPRA is directly focused on the interests and rights of individual students and parents. FERPA's focus is two

steps removed. *Gonzaga*, 536 U.S. at 287 (citations omitted). The same is not true of the PPRA.

### 2.    PPRA enforcement will not strain judicial competence

The PPRA is plain and clear, and the rights it recognizes are specific, not vague or amorphous. *Wilder v. Virginia Hosp. Ass'n.*, 496 U.S. 498, 499 (1990) (cleaned up); *Wright v. City of Roanoake Redevelopment and Housing Authority*, 479 U.S. 418, 432 (1987) (a right to a "reasonable" allowance is sufficiently specific to be enforceable). Tellingly, the Defendants do not claim that they are confused about the information that the member parents seek. Rather, they argue that they are entitled to withhold it.

### 3.    The PPRA unambiguously imposes binding obligations on the Defendants

The PPRA does more than express a mere congressional preference for a certain kind of conduct. Instead, it explicitly commands the Defendants to provide individual students and parents with specified information and an opt out opportunity. *See* 20 U.S.C. §§ 1232h(a); (b); (c)(1)(A)(i); (c)(2); (c)(5)(B); (d); (f); 34 CFR § 98.4.

### 4.    The Congress did not shut the door on Plaintiff's § 1983 claim

The Defendants seemingly argue that Congress foreclosed § 1983 enforcement by requiring the Secretary of Education to investigate, process, review, and adjudicate violations of the rights established under 20 U.S.C. § 1232h, and by the agency's regulations for administrative complaints. DE 12, p. 33. But this is not the

test. Rather, the Defendants must demonstrate that Congress has *expressly* "shut the door" on Plaintiff's § 1983 claim. *Golden State Transit Corp.*, 493 U.S. at 107. This, they fail to do.

A defendant may show that Congress specifically foreclosed a remedy under § 1983 by providing a comprehensive enforcement mechanism for protection of a federal right. The test is not whether administrative mechanisms are available to protect the plaintiff's interests. Rather, the Defendants must overcome their burden of showing that Congress has expressly withdrawn a § 1983 remedy. This burden is heavy, for "'We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for the deprivation of a federally secured right." *Golden State Transit Corp.*, 493 U.S. at 107 (citations omitted).

At the time of the PPRA's enactment, a parent's constitutional right to control the education and upbringing of her child was settled law. The PPRA codified an informational aspect of this broad right and created a limited administrative complaint and enforcement mechanism for the purpose of facilitating agency oversight of local school districts (like the District here) that accept federal funds. Neither the PPRA's text nor its legislative history supports the notion that by creating this agency oversight pathway, Congress expressly intended to preclude the member parents from relying on § 1983 as a remedy for the Defendants' violations of their rights. Given that a parent's constitutional right to choose a school for her child depends on her ability to obtain information about what is happening in the classroom, and given that this right was, at the time of enactment, necessarily

protected by a § 1983 action, it would be illogical to conclude that Congress tacitly but specifically intended the PPRA's oversight mechanism to preclude a mother from bringing a § 1983 action as a remedy for the deprivation of her federally secured informational rights. *See Wright*, 479 U.S. at 424.

### 5.    The District violates the PPRA by collecting information required to create a Gender Support Plan

The PPRA provides that "No student shall be required . . . to submit to a survey, analysis, or evaluation [on a covered subject]. . . without the prior written consent of the parent." 20 U.S.C. § 1232h(b). Covered subjects include "mental or psychological problems of the student or the student's family" (§1232h(b)(2)), "sex behaviors or attitudes" (§1232h(b)(3)), and "critical appraisals of other individuals with whom respondents have close family relationships" (§1232h(b)(5)).

The Defendants argue that this parental consent right is not triggered, because the students are not "required" to complete the Gender Support Plan at all. However, this argument is circular and deprives the statute of all meaning. Defendants seem to argue that participation was not required because the participants, (who couldn't consent if participation was required), consented to filling out the survey. The Northern District of Indiana summed up this argument by saying, "The intent behind the statute—to require parental consent for intrusive surveys—is frustrated if schools can avoid obtaining that consent simply by calling a survey voluntary, and proving it was voluntary by [obtaining the minor's consent]." *Rhoades v. Penn-Harris-Madison Sch. Corp.*, 574 F. Supp. 2d 888, 903 (N.D. Ind. 2008). The Rhoades court found this circular argument insufficient to justify the grant of a Motion for Summary

Judgment. *Id*. That Court cast the issue of whether the survey was voluntary as a question of fact, appropriate for merits adjudication. *Id*. Given that minors cannot "consent" in this context, and parents are not notified, the Gender Support Plan is clearly a "required" survey within the meaning of the PPRA, and any argument otherwise is appropriate for merits adjudication as a matter of fact.

It is also clear that the required survey asks for information about topics covered by the PPRA. Inquiries about a student's gender identity necessarily touch upon "sex behaviors or attitudes," and asking a student whether their parents are likely to be supportive seeks a "critical appraisal[] of [another] individual[] with whom respondent[] [has a] close family relationship[]." *See* 20 U.S.C. § 1232h(b). The PPRA flatly prohibits questions on these topics without prior parental consent. Defendants' Policy asks a student for a critical appraisal of their parent's attitudes towards sexual attitudes or behaviors, and then determines whether to seek parental consent based on the answer. This turns the PPRA's statutory framework on its head.

## IV. Plaintiff's federal claims should not be dismissed, thus its state law claims should likewise not be dismissed and the named officials are proper parties

Defendants argue that because all of the Plaintiff's federal claims should be dismissed Plaintiff's state law claims should likewise be dismissed. Plaintiff does not believe its federal claims should be dismissed and likewise argues the Court should hear the related state law claims.

Additionally, the individual Defendants sued in their official capacities are not sued for money damages. Instead, Plaintiff has requested injunctive relief to prevent

these individuals, who are violating Plaintiff's members' federal and state constitutional rights, from continuing to act. This is how the system is supposed to work. "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989); *see Ex parte Young*, 209 U.S. 123 (1908). It is only when money damages are sought that individual defendants in their official capacity are treated as the state itself. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Finally, this Court's authority is to enjoin *persons* not laws or policies. *See* Fed. R. Civ. P. 65(d)(2). The Court must be permitted to enjoin the Defendants from acting to enforce the District's unconstitutional Policy.

## CONCLUSION

Defendants' Motion to Dismiss fails on all counts. Plaintiff has standing because Plaintiff's members have a concrete injury that is actual or imminent, that is fairly traceable to the Defendants' Policy, and the Court can provide relief. Plaintiff's claims for violation of their substantive due process rights, religious free-exercise rights, and rights pursuant to the PPRA pass the pleading requirements and are valid claims. Defendants fail to show a rational basis for their Policy, much less a compelling interest. As such, Plaintiff is entitled to pursue its claims against Defendants. Plaintiff requests the Court deny Defendants' Motion to Dismiss.

Respectfully Submitted,

AMERICA FIRST LEGAL FOUNDATION

*/s/ Nicholas R. Barry\**

Nicholas R. Barry
TN Bar No. 031963
Nicholas.Barry@AFLegal.org

Reed D. Rubinstein*
DC Bar No. 400153
Reed.Rubinstein@AFLegal.org
300 Independence Ave SE
Washington, DC 20003
Telephone: (202) 964-3721
*Pro hac vice granted


WISCONSIN INSTITUTE FOR LAW &
LIBERTY

/s/ Luke N. Berg
Luke N. Berg (WI Bar No. 1095644)
Rick Esenberg (WI Bar No. 1005622)
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Luke@will-law.org

Attorneys for Parents Protecting Our
Children, UA