IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

Parents Protecting Our Children, UA,

                Plaintiff,

   v.

Eau Claire Area School District, Wisconsin; Tim Nordin;
Lori Bica; Marquell Johnson; Phil Lyons;
Joshua Clements; Stephanie Farrar; Erica Zerr; and
Michael Johnson,

                Defendants.

OPINION AND ORDER

22-cv-508-slc

---

Plaintiff Parents Protecting Our Children is an unincorporated association (UA) of parents whose children attend schools within defendant Eau Claire Area School District in Wisconsin. The remaining defendants are school officials who are being sued in their official capacities. Plaintiff alleges that defendants' internal guidance on the treatment of transgender, non-binary, and gender-nonconforming students violates the following constitutional and statutory rights of its members: (1) the care, custody, and control of their children under the due process clause of the Fourteenth Amendment and the Wisconsin Constitution; (2) the free exercise of religion under the First Amendment and the Wisconsin Constitution; and (3) the right to obtain information and opt out of specified public school activities under the Protection of Pupil Rights Amendment (PPRA), 20 U.S.C. § 1232h. Plaintiff seeks to enjoin defendants from relying on, using, implementing, or enforcing the guidance.

Before the court is defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of standing and under Rule 12(b)(6) for failure to state a claim. Dkt. 11. The court also has received a motion for leave to file an amicus curiae brief submitted by the Eau Claire Area LGBTQI+ Community in support of defendants. Dkt. 10.

For the reasons stated below, I am granting defendants' motion to dismiss this case for lack of standing. I am denying the motion for leave to file an amicus curiae brief because the amicus brief does not help resolve the question of standing.

**FACTUAL ALLEGATIONS**

When considering a motion to dismiss for lack of standing or for failure to state a claim, the court accepts as true all material allegations of the complaint, drawing all reasonable inferences therefrom in plaintiff's favor unless standing is challenged as a factual matter. *Bria Health Services, LLC v. Eagleson*, 950 F.3d 378, 381-82 (7th Cir. 2020). Defendants do not challenge this court's reliance on the facts in the complaint for the purpose of deciding their motion, although they reserve the right to contest plaintiff's allegations in the future. Def. Br. in Support, dkt. 12, at 2, n.2. This is what plaintiff alleges:

**I. The Parties**

Plaintiff Parents Protecting Our Children, UA, is a group of parents who have created an unincorporated nonprofit association in accordance with Wis. Stat. § 184.01. The unidentified members of the association reside in the Eau Claire Area School District (ECASD) and have children who attend ECASD schools. Plaintiff names ECASD as a defendant, along with District Superintendent Michael Johnson and these members of the Eau Claire Area Board of Education: Tim Nordin, president; Lori Bica, vice president; Marquell Johnson, clerk/governance officer; Phil Lyons, treasurer; and members Joshua Clements, Stephanie Farrar, and Erica Zerr.

**II. Gender Identity Support Guidance, Plan, and Training**

ECASD has adopted a district-wide internal policy titled "Administrative Guidance for Gender Identity Support"(the Guidance), which initiates a process under which a school and its staff create a "Gender Support Plan" with a student. Attached to plaintiff's complaint is a complete copy of the guidance, a blank and fillable copy of a gender support plan, and a copy of a facilitator guide for staff training on "safe spaces." Dkt. 1-3 to 1-5. Here is a summary of the relevant portions of these documents:

**A. The Guidance**

The first two and a half pages of the Guidance state the following purpose and process:

**I. Purpose:**

The purpose of this Guidance is: 1) to foster inclusive and welcoming environments that are free from discrimination, harassment, and bullying regardless of sex, sexual orientation, gender identity or gender expression; and 2) to facilitate compliance with district policy.

For the purpose of this Guidance, a transgender individual is an individual that asserts a gender identity or gender expression at school or work that is different from the gender assigned at birth. . . .

This Guidance is intended to be a resource that is compliant with district policies, local, state, and federal laws. They are not intended to anticipate every possible situation that may occur.

**II. The Process:**

The following guidelines should be used to address the needs of transgender, nonbinary, and/or gender non-conforming students:

a. A transgender, non-binary, and/or gender-nonconforming student is encouraged to contact a staff member at the school to address any concerns, needs, or requests. This staff member will notify and work with the principal/designee. Parents/guardians of transgender, non-binary, and/or gender non-conforming students may also initiate contact with a staff member at school.

b. When appropriate or necessary, the principal or designee will schedule a meeting to discuss the student's needs and to develop a specific Student Gender Support Plan when appropriate to address these needs. Documentation shall include date, time, location, names, and titles of participants, as well as the following information. The plan shall address, as appropriate:

1. The name and pronouns desired by the student (generally speaking, school staff and educators should inquire which terms a student may prefer and avoid terms that make the individual uncomfortable; a good general guideline is to employ those terms which the individual uses to describe themself

3

>    2. Restroom and locker room use
>
>    3. Participation in athletics and extracurricular activities
>
>    4. Student transition plans, if any. Each individual transitions differently (if they choose to transition at all), and transition can include social, medical, surgical, and/or legal processes
>
>    5. Other needs or requests of the student
>
>    6. Determination of a support plan coordinator when appropriate
>
>                             *   *   *
>
> Administrators and staff should respect the right of an individual to be addressed by a name and pronoun that corresponds to their gender identity.  *A court-ordered name or gender change is not required, and the student need not change their official records*.

Dkt. 1-3 at 1-2 (emphasis in original).

The Guidance also discusses media and communication, official records and legal name changes, sports and extracurricular activities, dress codes, student trips and overnight accommodations, and training and professional development.  Although the Guidance states that "[m]andatory permanent student records will include the legal/birth name and legal/birth gender," it provides that "to the extent that the district is not legally required to use a student's legal/birth name and gender on other school records or documents, the school will use the name and gender preferred by the student."  Dkt. 1-3 at 3.  "For example, Student ID cards are not legal documents, and therefore, may reflect the student's preferred name."  *Id.*

With respect to parents and guardians, the Guidance states that

> Some transgender, non-binary, and/or gender-nonconforming students are not "open" at home for reasons that may include safety concerns or lack of acceptance. School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent/guardian.

Dkt. 1-3 at 2.

As plaintiff points out, the Guidance does not contain a requirement to notify a student's parents or guardian that the student is or will be using a new name or gender identity, except to the extent that "ECASD will only make name changes in Skyward[1] after the completion of a Gender Support Plan and with parent/guardian permission." *Id.* at 4. However, there are no provisions mandating secrecy apart from a general provision in the media and communication section, which states that:

> Protecting the privacy of transgender, non-binary, and/or gender non-conforming students and employees must be a top priority for the spokesperson and all staff. All student and personnel information shall be kept strictly confidential as required by District policy and local, state, or federal privacy laws.

*Id.* at 3.

### B. Gender Support Plan

The gender support plan (the Plan) makes the following statements in a separate text box at the top of the first page:

> The purpose of this document is to create shared understanding about the ways in which the student's authentic gender will be accounted for and supported at school. School staff, family, and the student should work together to complete this document.
>
> If parents are not involved in creating this plan, and student states they do not want parents to know, it shall be made clear to the student that this plan is a student record and will be released to their parents when they request it. This is a not a privileged document between the student and the school district.

Dkt. 1-4 at 1.

---

[1] "Skyward" is a software program used by ECASD to manage student records and similar information.

The form contains spaces for district staff to record a new name, pronouns, and gender for a child; select which intimate facilities (restroom, locker room, and overnight lodging on field trips) the child will use; and identify who should be told about the child's newly acquired gender identity (asking about district staff, building staff, and friends and classmates but not parents or guardians). *Id.* at 2. The Plan specifically asks if parents/guardians are aware of "their child's gender status" and "student's requests at school" with yes/no check boxes. The Plan identifies two actions to take if the "yes" box is checked with respect to parent knowledge: walking the parents through the Skyward name process and student ID card change and identifying preferred name, pronouns, and intimate facilities. The form does not identify any actions to take if a "no" box is checked. *Id.* There are also sections for planning for use of facilities, extracurricular activities, and supporting the student and any siblings. *Id.* at 3-4.

### C. Staff Training

Plaintiff alleges that ECASD has conducted training sessions for its teachers on the Guidance for which it prepared a "Facilitator Guide" for "Session 3: Safe Spaces." With respect to slide 56, titled "Talk amongst yourselves!," the guide directs the facilitator to guide a discussion and reminds facilitators that

> [P]arents are not entitled to know their kids' identities. That knowledge must be earned. Teachers are often straddling this complex situation. In ECASD, our priority is supporting the student.
>
> Dkt. 1-5 at 2.

The guide also discusses slide 57, titled "Religion":

> Since Slide 56 will most likely focus on parents' religious objections to LGBTQIA+ people, it's important to take a moment and reaffirm that religion is not the problem (after all, there are millions of queer people of various faith traditions); rather, it's the weaponization of religion against queer people.
>
> *Id.* at 3.

6

In addition, an online training session titled "Safe Spaces Part Two" states:

> We understand and acknowledge that teachers are often put in terrible positions caught between parents and their students. But much like we wouldn't act as stand-ins for abuse in other circumstances, we cannot let parents' rejection of their children guide teachers' reactions and actions and advocacy for our students.
>
> \* \* \*
>
> We handle religious objections too often with kid gloves . . . . [If the parents' have a] faith-based rejection of their student's queer identity [then the school staff] must not act as stand-ins for oppressive ideas/behaviors/attitudes, even and especially if that oppression is coming from parents.

Dkt. 1, ¶¶ 38-39.

Plaintiff alleges that teachers understand the Guidance and training as a mandate to interfere with the parent–child relationship, pointing to a flyer posted by one teacher at North High School in ECASD, which states: "If your parents aren't accepting of your identity, I'm your mom now." Dkt. 1, ¶ 48.

## OPINION

Defendants challenge the complaint under Rule 12(b)(1) for lack of standing, and under Rule 12(b)(6) for failure to state a claim. Because the court agrees that plaintiff lacks standing, this opinion will address only the first challenge under Rule 12(b)(1).

### I. Legal Standard Regarding Standing

A complaint must plausibly allege standing to survive a Rule 12(b)(1) challenge. *Larkin v. Fin. Sys. of Green Bay, Inc.*, 982 F.3d 1060, 1064 (7th Cir. 2020) ("At the pleading stage, the standing inquiry asks whether the complaint 'clearly . . . allege[s] facts demonstrating each element in the doctrinal test.'") (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as*

*revised* (May 24, 2016)); *Silha v. ACT, Inc.*, 807 F.3d 169, 173-74 (7th Cir. 2015); *Scruggs v. Nielsen*, 2019 WL 1382159, at *1 (N.D. Ill. Mar. 27, 2019). An organization like plaintiff has associational standing to sue on behalf of its members if: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017); *United African Org. v. Biden*, 2022 WL 3212370, at *5 (N.D. Ill. Aug. 9, 2022). Defendants argue that plaintiff cannot establish the first element because the plaintiff's individual parent members do not have standing in their own right.

To establish Article III standing, a litigant "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo,* 578 U.S. at 338 (internal citations omitted); *see also Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 667 (7th Cir. 2021) (citing same). Disputed in the instant case is the injury-in-fact element, which requires "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see also Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019) ("Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions."). To be concrete, the injury "must be de facto; that is, it must actually exist." *Spokeo,* 578 U.S. at 340 (internal quotation omitted). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).

With respect to standing to seek injunctive relief, the Supreme Court has held that a "plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *City of Los Angeles v. Lyons*, 461 U.S. 95,

8

101-02 (1983) (internal citations omitted); *see also Beley v. City of Chicago*, 2013 WL 3270668, at *3 (N.D. Ill. June 27, 2013) (Citing same for proposition that "[t]o establish standing for injunctive relief or a declaratory judgment, a party must show a real and immediate threat of injury.").

## II.  Injury In Fact

Plaintiff alleges that ECASD is providing "psychosocial medical/psychological care through transgender social transition" for which it is intentionally not obtaining parental consent.  Dkt. 1 at ¶¶ 64-65.  Plaintiff also alleges that the non-public nature of the policy and "secrecy with which schools are to operate" means there is no way for its parent members to determine if their child has been "targeted by the school." Dkt. 1, ¶ 75.  In support of its allegations, plaintiff points out that the Guidance and Plan documents do not contain any minimum age limit or a requirement to notify the student's parents that the child is or will be using a new name or gender identity, opposite-sex intimate facilities, or opposite-sex overnight lodging during school activities.

According to plaintiff, defendants' Guidance "mandates" that schools and teachers hide critical information regarding a child's health from the child's parents and take action specifically designed to alter the child's mental and physical well-being, including:  (1) allowing and requiring district staff to change a child's name, pronouns, and intimate facility use without the parents' knowledge or consent; (2) requiring a school and its staff to hold secret meetings with children to develop a gender support plan; and (3) requiring school officials, teachers, and administrators to continue using the child's given name and pronouns when interacting with the child's parents as to not alert parents to the changes the school has made.  Complaint, dkt. 1, at 2, ¶2.  However, contrary to plaintiff's interpretation, a fair reading of the Guidance and Plan documents shows that they do not *mandate* the exclusion of parents and guardians.  *See John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, __ F. Supp. 3d __, 2022 WL 3544256, at *6-7

9

(D. Md. Aug. 18, 2022) (finding same in Rule 12(b)(6) review of similar guidelines related to student gender identity); *id*. at 7 ("My review of the Guidelines reveals that the Plaintiff Parents' argument is based on a selective reading that distorts the Guidelines into a calculated prohibition against the disclosure of a child's gender identity that aims to sow distrust among MCPS students and their families.").

Actually, defendants encourage family involvement in developing a gender support plan: "The purpose of this document is to create shared understanding about the ways in which the student's authentic gender will be accounted for and supported at school. School staff, family, and the student should work together to complete this document." Dkt. 1-4 at 1. True, the Guidance anticipates that some students may chose not to tell their parents about their gender nonconformity or transgender status, and it instructs school personnel to "[s]peak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent/guardian," dkt. 1-3. That being so, the Guidance does not instruct staff to keep the information secret and it makes clear that the student's name will not be changed in the district's system without parent/guardian permission. Further, the Plan document clearly notes that the Plan will not be kept confidential from the student's parents if they ask for it. *Id.*

More critical to the standing analysis, however, is that plaintiff does not allege (1) that any of its members' children are transgender or gender nonconforming, (2) that the district has applied the gender identity support Guidance or Plan with respect to its members's children or any other children, or (3) that any parent or guardian has been denied information related to their child's identity. Defendants argue that plaintiff's general distress about the gender identity policy does not demonstrate an actual injury because plaintiff's fear that the policy might be applied to one of its members' children in the future is too speculative to confer standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) ("[W]e have repeatedly reiterated that 'threatened injury must be certainly

10

impending to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient.").

In an initial cursory argument, plaintiff contends that *Clapper* does not apply because defendants' Guidance is currently harming its members by providing "an experimental and controversial form of psychological/psychosocial medical treatment" without parental notice or consent. Dkt. 15 at 7. However, the complaint does not include allegations supporting an inference that any actual harm is occurring now. Thus, the crux of the parties' dispute is whether the *possible* application of the policy to plaintiff's members and their children is sufficiently imminent and harmful to confer standing. *See Parents Defending Educ. v. Linn-Mar Cmty. Sch. Dist.*, 2022 WL 4356109, at *9 (N.D. Iowa Sept. 20, 2022) ("In the absence of enforcement on a facial challenge, courts evaluate whether injury was caused through a chilling effect or through a credible threat of enforcement.").

As plaintiff points out, "*Clapper* does not . . . foreclose any use whatsoever of future injuries to support Article III standing." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015). The Court has explained that

> Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a "substantial risk" that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm.

*Clapper*, 568 U.S. at 414 n.5 (internal citations omitted).

*See also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."); *TransUnion LLC v. Ramirez*, ___ U.S. ___, 141 S. Ct. 2190, 2210 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.").

11

Nonetheless, "[i]n *Clapper*, the Court decided that human rights organizations did not have standing to challenge the Foreign Intelligence Surveillance Act (FISA) because they could not show that their communications with suspected terrorists were intercepted by the government" but instead relied only on their suspicions that "such interceptions might have occurred." *Remijas*, 794 F.3d at 693. The Court went on to note that "to the extent that the 'substantial risk' standard is relevant and is distinct from the 'clearly impending' requirement, respondents fall short of even that standard, in light of the attenuated chain of inferences necessary to find harm here. . . Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper*, 568 U.S. at 414 n.5.

Plaintiff argues that the potential harm in this case is not as attenuated as that in *Clapper*. Instead, plaintiff contends that this case is more analogous to *Remijas*, 794 F.3d at 690 and 693, in which all plaintiffs had their identity stolen through a hack that targeted defendant but only some plaintiffs suffered fraudulent charges. The court in *Remijas* held that plaintiffs had shown a substantial risk of harm from the data breach because it was plausible to infer that the purpose of the hack was to make fraudulent charges or to assume stolen identities with respect to all of the affected plaintiffs. *Id.* at 693. The court of appeals explained that "[u]nlike in *Clapper*, where respondents' claim that they would suffer future harm rested on a chain of events that was both 'highly attenuated' and 'highly speculative,' the risk that Plaintiffs' personal data will be misused by the hackers who breached Adobe's network is immediate and very real." *Id*. (quoting *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1214 (N.D. Cal. 2014) (involving similar data breach case)).

I am not persuaded by plaintiff's argument.

Plaintiff's entire standing argument is premised on a speculative chain of possibilities, including future choices made by individuals who have not yet been identified, indeed who *cannot* yet be identified because they have *not* acted, and they might *never* act. This will not

12

suffice.  "[T]he failure to raise a right to relief above the speculative level is the very definition of insufficient pleading." *Phillips v. Board*, 2017 WL 3503273 (N.D. Ind. 2017) at *3 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Plaintiff's asserted injuries are based on its belief that the Guidance one day will interfere with one of its members' right to direct the upbringing of their child.  Therefore, to sustain an injury, a member's child must:  (1) develop a belief that they have a gender identity that differs from their biological sex; (2) affirmatively approach a district employee and request gender identity support; (3) request a gender support plan; and (4) make the request without parental consent or knowledge.  Also part of this chain of possibilities are:  (5) the school must not discuss the gender support plan with the parent and/or (6) the parent must not request to see the student's educational records.

As the Northern District of Iowa recently held in denying a motion for a preliminary injunction seeking to prevent enforcement of a similar gender identity support policy and plan:

> Though the Court does not doubt their genuine fears, the facts currently alleged before the Court do not sufficiently show the parents or their children have been injured or that they face certainly impending injury through enforcement of the Policy. The theory that (1) their child will express a desire for or indicate by mistake a desire for a plan, (2) the child will be given a plan, (3) without parental consent or knowledge, (4) and the information will be hidden or denied when parents ask requires too many speculative assumptions without sufficient factual allegations to support a finding of injury.

*Parents Defending Educ.*, 2022 WL 4356109, at *9.

Reliance on such speculative, discretionary acts of others precludes a finding of standing.  *Id.*; *see also The Cornucopia Inst. v. United States Dep't of Agric.*, 260 F. Supp. 3d 1061, 1069 (W.D. Wis. 2017) ("Like *Clapper*, plaintiffs' chain of causation here is further weakened by its reliance on third parties' discretionary acts.").

Nonetheless, plaintiff insists that because of the Guidance:  (1) its members will be denied critical information necessary for its members to exercise their constitutional rights; (2)

its members must surrender their constitutional right to receive public education for their children; and (3) its members will be denied their right under the PPRA to obtain information and opt out of specified public school activities. Although plaintiff cites a number of additional cases and standing-related doctrines in an attempt to show a possible injury, I am not persuaded its arguments or cited authority for the reasons stated below.

### A. Threatened Loss of and Interference With Constitutional Right

Plaintiff argues that courts have recognized that a threatened violation of constitutional rights amounts to irreparable harm and should be actionable. *See Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (Regarding challenge to Small Business Administration's use of racial preferences in awarding funding, court held "when constitutional rights are threatened or impaired, irreparable injury is presumed."); *Democratic Nat'l Comm. v. Bostelmann*, 451 F. Supp. 3d 952, 969 (W.D. Wis. 2020) (State-imposed voting restrictions are "threatened loss of constitutional rights [that] constitute[] irreparable harm."). However, unlike in this case, the policies and statutes at issue in *Vitolo* and *Bostelmann* applied directly to the plaintiffs themselves and barred the exercise of *their* constitutional rights. *See Vitolo*, 999 F.3d at 358-59 ("The injury here is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.") (internal citations omitted). Although plaintiff argues that defendants' Guidance denies its members the information they need to exercise their constitutional decision-making authority regarding their children, the actual application of the Guidance to *their* children remains fatally speculative for the reasons discussed above.

Plaintiff cites *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007), in which the Court held that parents of children enrolled in a school district had standing to challenge a policy using race to reassign the school students would attend, even though there was no guarantee that the policy would be applied to change the school of any

14

particular child. Even though plaintiff's members' children had not yet been denied their preferred school because of their race, the Court found that harm was not speculative because *every* student enrolled in the school district would be "forced to compete in a race-based system that may prejudice" them. *Id.* at 719. In other words, the school assignment policy created a systemic process that would affect all students as they matriculated from elementary school to middle school or middle school to high school. Here, in contrast, plaintiff's alleged lack-of-information injury is not systemic: the Guidance will not be applied to all children, or even most children. Only a small fraction of ECASD students ever will make use of the policy, and a fraction of that group *will* alert their parents. Whether any of plaintiff's members' children will seek assistance under the Guidance without their parents' knowledge or input is completely conjectural.

Plaintiff also cites *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), (which involved the constitutionality of a city ordinance banning the sale of hollow-point ammunition) for the proposition that a violation of a constitutional right occurs when government action makes the exercise of a constitutional right nearly impossible.[2] Plaintiff notes that the Ninth Circuit recognized that the "Second Amendment . . . does not explicitly protect ammunition" but held that "[n]evertheless, without bullets, the right to bear arms would be meaningless" and "[t]hus the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Id.* at 967. However, the court of appeals made this finding in the context of determining whether a constitutional claim had been stated, not whether the plaintiff had standing. In addressing standing, the *Jackson* court applied the injury-in-fact test outlined in *Lujan*: plaintiff must show injury in fact that is concrete and particularized and actual or imminent and not conjectural or hypothetical. *Id.* The court of

---

[2] As discussed at-length above, plaintiff mischaracterizes the Guidance as actively hiding a constitutional violation from parents.

appeals found that plaintiff Jackson satisfied that standard because she was a gun owner who would purchase hollow-point ammunition within San Francisco but-for the challenged ordinance. *Id.* Therefore, *Jackson* is not on point and does not support plaintiff's contention that it has standing in this case based on a denial of information.[3]

### B. Pre-Enforcement Challenge

Plaintiff also asserts that it has standing to bring a pre-enforcement challenge to the district's Guidance under Supreme Court precedent allowing "pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159; *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat"). Under this precedent, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see also Brown v. Kemp*, 506 F. Supp. 3d 649, 656 (W.D. Wis. 2020) (citing same).

---

[3] After briefing was completed, plaintiff filed a notice of supplemental authority, dkt. 19, in which it cites *Deanda v. Becerra*, 2022 WL 17572093 (N.D. Tex. Dec. 8, 2022), without discussion, as support for its standing argument. Defendants did not have the opportunity to address this case, but their input is not necessary because *Deanda* does not does change this court's conclusion. *Deanda* addresses a father's challenge to Title X of the Public Health Service Act, 42 U.S.C. §§ 300, which "mak[es] comprehensive voluntary family planning services readily available to all persons desiring such services." *Id.* at 1. The federal statute expressly instructed grant recipients that they could not require parental consent for their child's access to contraception (although they should "encourage family participation") and it did not allow parents to opt out of family planning services for their children. *Id.* at 3-6. But Texas law confers upon parents the right to consent to their children's medical treatment, along with general standing to file suit for a violation of that right. *Id.* at 6. The court in *Deanda* found that the father's loss of his state-law right to consent to the medical treatment of his minor children constituted an injury in fact, even though an actual medical situation had not yet arisen. *Id.* at 3 and n.1.

Although the "plaintiff's fear of prosecution and self-censorship constitute the injury for standing purposes" in such cases, "the mere existence of a statute [or in this case, a policy] adverse to plaintiff's interests is not sufficient to show justiciability." *Deida v. City of Milwaukee*, 192 F. Supp. 2d 899, 905-06 (E.D. Wis. 2002). The Supreme Court has made clear that "persons having no concrete fears that a policy or statute will be applied against them, except for those fears that are imaginary or speculative, are not accepted as appropriate plaintiffs." *Babbitt*, 442 U.S. at 298 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971) and *Golden v. Zwickler*, 394 U.S. 103 (1969)). As discussed above, plaintiff has not shown that its members are under any real or credible threat of being subjected to the Guidance. *See Anders v. Fort Wayne Cmty. Sch.*, 124 F. Supp. 2d 618, 628-30 (N.D. Ind. 2000) (citing *Babbitt* and Seventh Circuit cases for same in case involving policy to search vehicles on school property). Although plaintiff argues that parents *may* choose to withdraw their children from school or abandon their rights to public education in order to avoid the policy, that scenario also is speculative and is not based on any realistic or impending action by district staff.

### C. Unconstitutional Conditions Doctrine

As plaintiff notes, the unconstitutional conditions doctrine prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his or her exercise of a constitutional right. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited."); *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 986 (7th Cir. 2012) ("Understood at its most basic level, the doctrine aims to prevent the government from achieving indirectly what the Constitution prevents it from achieving directly."); *see also Carson v. Makin*, 142 S. Ct. 1987

(2022) (tuition assistance program penalized free exercise of religion by disqualifying private religious schools from generally available benefit for families whose school district did not provide public secondary school).

However, the doctrine does not "give rise to a constitutional claim in its own right; the condition must actually cause a violation of a substantive [constitutional] right." *EklecCo NewCo LLC v. Town of Clarkstown*, 2019 WL 2210798, at *12 (S.D.N.Y. May 21, 2019) (quoting *U.S. v. Oliveras*, 905 F.2d 623, 628 n.8 (2d Cir. 1990), and citing *Dolan v. City of Tigard*, 512 U.S. 374, 407 n.12 (1994) (noting unconstitutional conditions doctrine "has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question")).

Plaintiff invokes the unconditional conditions doctrine in making a cursory argument that defendants' Guidance conditions the right to attend public school on parents surrendering their constitutionally protected right to the care, custody, and control of their children. However, the argument does not provide plaintiff with a path to standing. Plaintiff's citations to *Perry* and *Carson* are not helpful because neither case discusses the unconditional conditions doctrine in terms of standing or addresses the speculative nature of plaintiffs' alleged injuries. In *Perry*, the Supreme Court merely reaffirmed that the government cannot deny someone a government benefit because that person exercised a constitutionally protected right, such as free speech. 408 U.S. at 597. And in *Carson*, the Court emphasized the general rule that the state violates the free exercise clause when it excludes religious observers from otherwise available public benefits. 142 S. Ct. at 1996. In the instant case, none of plaintiff's members have been subject to retaliation or excluded from anything for their opposition to the Guidance. In addition, and as explained above, plaintiff's allegation that the Guidance hinders its members' rights to send their children to public school is too speculative to confer standing.

**D. PPRA and Informational Standing**

Plaintiff contends that defendants have violated its rights related to student surveys and evaluations under the PPRA, 20 U.S.C. § 1232h, and its implementing regulations, 34 C.F.R. § 98.4(a). Specifically, plaintiff cites §§ 1232h(b)(2), (3), and (5), which provide that "[n]o student shall be required, as part of any applicable program, to submit to a survey, analysis, or evaluation that reveals information concerning . . . mental or psychological problems of the student or the student's family, sex behavior or attitudes, or critical appraisals of other individuals with whom respondents have close family relationships" without "the prior written consent of the parent." In addition, plaintiff points to 34 C.F.R. §§ 98.4(a)-(b), which provide in relevant part that no student shall be required to submit without prior parental consent to a psychiatric or psychological examination, testing, or treatment in which the primary purpose is to reveal information concerning sex behaviors and attitudes and other sensitive issues. The regulations define a "psychiatric or psychological examination or test" as a method of obtaining information "that is not directly related to academic instruction and that is designed to elicit information about attitudes, habits, traits, opinions, beliefs or feelings." § 98.4(c)(1). According to plaintiff, the above provisions "describe[] exactly what occurs when the District requires students to complete a gender support plan with school staff." Dkt. 15 at 21.

Although the parties debate whether there is a private right of action under PPRA that can be brought under § 1983, it is unnecessary to reach those arguments because plaintiff has failed to show that it has suffered, or is at a substantial risk of suffering, an injury in fact that would permit it to pursue any such claims. Plaintiff argues that it has informational standing because its members are injured by the district's "promise that it will deny them information about their children that the PPRA requires the District to disclose." Dkt. 15 at 21. However, as explained above, this argument is based on a mischaracterization of the Guidance and Plan documents. Neither document requires students to complete a gender support plan without

19

their parents' consent, and neither document states that information will be withheld from parents. Moreover, plaintiff has not alleged that defendants have required any child to submit to any type of survey, analysis, or evaluation in conjunction with the gender identity support Guidance. Accordingly, plaintiff has failed to show standing on this ground as well.

## CONCLUSION

Defendants frame this lawsuit as arising out of "plaintiff's members uncomfortableness with transgender individuals, and their speculative fears about what would happen if their child became gender non-conforming." Def. Reply, dkt. 18, at 2. Plaintiff rejects this characterization, framing its lawsuit as a defense of the parental, religious, and statutory rights of its members to raise their children as they see fit. Pl.'s Resp., dkt. 15, at 51. It's a fraught topic, and both sides are entitled to their views on the issues that underlie ECASD's Gender Identity Policy. At this juncture, however, the issue before this court is narrow and procedural: does plaintiff have standing to bring the instant lawsuit? For the reasons stated above, I have concluded that it does not.

## ORDER

IT IS ORDERED that defendants' motion to dismiss, dkt. 11, is GRANTED, and the motion for leave to file an amicus curiae brief, dkt. 10, is DENIED as unnecessary. The case is DISMISSED without prejudice for lack of subject matter jurisdiction.

Entered this 21st day of February, 2023.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge